# 23-6247-cr

To be argued by:
**DARRELL FIELDS**

_____
_____

**United States Court of Appeals
for the Second Circuit**

_____

Docket No. 23-6247-cr

_____

UNITED STATES OF AMERICA,

Appellee,

-against-

ETHAN PHELAN MELZER, a/k/a ETIL REGGAD,

Defendant-Appellant.

_____

APPEAL FROM A FINAL JUDGEMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

**BRIEF FOR DEFENDANT-APPELLANT ETHAN PHELAN MELZER**

_____

FEDERAL DEFENDERS OF NEW YORK, INC.
   APPEALS BUREAU
52 Duane Street, 10th Floor
New York, New York 10007
Tel. No.: (212) 417-8742

Attorney for Defendant-Appellant
**ETHAN PHELAN MELZER**

**DARRELL FIELDS,**
Of Counsel

_____
_____

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . iii

JURISDICTIONAL STATEMENT PURSUANT TO FED. R. APP. P. 28(A) . . 1

QUESTION PRESENTED . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . 2

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . 3

    A.   The offense . . . . . . . . . . . . . . . . . . 3

    B.   The guilty plea . . . . . . . . . . . . . . . . 6

    C.   The Probation Office's Guidelines calculation and
       Sentencing Recommendation . . . . . . . . . . . . 8

    D.   Ethan Melzer's background and characteristics . . . . 9

       1.   Personal history . . . . . . . . . . . . 9

       2.   Mitigating circumstances . . . . . . . . . 15

    E.   The sentencing . . . . . . . . . . . . . . . 17

       1. The parties' sentencing submissions . . . . . . 17

       2. The sentencing proceeding . . . . . . . . . . 17

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . 19

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . 21

The sentencing court's reference to Melzer's dislike of
"Judeo and Christian values" created the appearance that
the length of the sentence the court imposed was affected
by a constitutionally impermissible consideration, and
requires that the case be remanded for sentencing . . . . . 21

1.  <u>The appeal waiver of the plea agreement is unenforceable because the case concerns an "arguably unconstitutional" use of Melzer's opposition to certain religions, to "Judeo and Christian values," at the sentencing</u>  . . . . . . .  21

2.  <u>Ethan Melzer must be resentenced</u>  . . . . . . . . .  23

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . .  27

**TABLE OF AUTHORITIES**

**CASES**

Bates v. Secretary Florida Dept. of Corrections,
  768 F.3d 1278 (11th Cir. 2014) . . . . . . . . . . . . . 24

Dawson v. Delaware,
  503 U.S. 159 (1992) . . . . . . . . . . . . . . . . . . 20

Deyton v. Keller,
  682 F.3d 340 (4th Cir. 2012) . . . . . . . . . . . . . 24

Offut v. United States,
  348 U.S. 11 (1954) . . . . . . . . . . . . . . . . . . 26

Pepper v. United States,
  562 U.S. 476 (2011) . . . . . . . . . . . . . . . . . . 23

United States v. Aine,
  386 Fed. App'x 16 (2d Cir. 2010) . . . . . . . . . . . 27

United States v. Bakker,
  925 F.2d 728 (4th Cir. 1991) . . . . . . . . . . . 20, 24

United States v. Borrero-Isaza,
  887 F.2d 1349 (9th Cir. 1989) . . . . . . . . . . . . . 20

United States v. Cline,
  27 F.4th 613 (8th Cir. 2022) . . . . . . . . . . . . . 22

United States v. Edwards-Franco,
  885 F.2d 1002 (2d Cir. 1989) . . . . . . . . . . . . . 26

United States v. Fell,
  531 F.3d 197 (2d Cir. 2008) . . . . . . . . . . . . . . 20

United States v. Fiore,
  381 F.3d 89 (2d Cir. 2004) . . . . . . . . . . . . . . 26

United States v. Gomez-Perez,
  215 F.3d 315 (2d Cir. 2000) . . . . . . . . . . . . . . 22

United States v. Guillen,
  561 F.3d 527 (D.C. Cir. 2009) . . . . . . . . . . . . . 22

United States v. Kaba,
  480 F.3d 152 (2d Cir. 2007) . . . . . . . . . . . . passim

United States v. Lee,
  523 F.3d 104 (2d Cir. 2008) . . . . . . . . . . . . . . . 21

United States v. Leung,
  40 F.3d 577 (2d Cir. 1994) . . . . . . . . . . . . . passim

United States v. Riggi,
  649 F.3d 143 (2d Cir. 2011) . . . . . . . . . . . . . . . 22

United States v. Tucker,
  404 U.S. 443 (1972) . . . . . . . . . . . . . . . . . . . 23

Wisconsin v. Mitchell,
  508 U.S. 476 (1993) . . . . . . . . . . . . . . . . . . . 20

Zant v. Stephens,
  462 U.S. 862 (1983) . . . . . . . . . . . . . . . . . . . 24

**STATUTES**

18 U.S.C. § 793(d) . . . . . . . . . . . . . . . . . . 2, 6

18 U.S.C. § 1114 . . . . . . . . . . . . . . . . . . . 2, 6

18 U.S.C. § 2339A . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . 17, 18

18 U.S.C. § 3661 . . . . . . . . . . . . . . . . . . . . 23

18 U.S.C. § 3742(a) . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . 1

**UNITED STATES SENTENCING GUIDELINES**

U.S.S.G. § 3A1.4(b) . . . . . . . . . . . . . . . . . . 7, 8

U.S.S.G. § 5G1.1(a) . . . . . . . . . . . . . . . . . . . 7

_____

**United States Court of Appeals
for the Second Circuit**

_____

Docket No. 23-6247-cr
_____

UNITED STATES OF AMERICA,

Appellee,

-against-

ETHAN PHELAN MELZER, a/k/a ETIL REGGAD,

Defendant-Appellant.

_____

APPEAL FROM A FINAL JUDGEMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

**BRIEF FOR DEFENDANT-APPELLANT ETHAN PHELAN MELZER**

_____

**JURISDICTIONAL STATEMENT PURSUANT TO FED. R. APP. P. 28(A)**

This is an appeal from a final judgment of conviction
rendered on March 3, 2023, and entered on March 6, 2023, in the
United States District Court of the Southern District of New York
(Honorable Gregory H. Woods). A.146-52.[1] Jurisdiction of the
appeal is in this Court pursuant to 28 U.S.C. § 1291 and 18
U.S.C. § 3742(a). Jurisdiction was in the district court under 18
U.S.C. § 3231. A timely notice of appeal was filed on March 10,

_____

[1] "A." references are to the relevant pages of the Appendix
for Appellant Ethan Phelan Melzer.

1

2023. A.153.

## QUESTION PRESENTED

In imposing the maximum sentence of 45 years' imprisonment, the sentencing court commented on the defendant's opposition to "Judeo and Christian values." And it indicated a view, in apparent opposition to the defendant's, that "those values" are "good for civilization." A.129.

The question presented is whether a resentencing is required because the court's remarks created a "sufficient risk that a reasonable observer, hearing or reading [them], might infer" that a constitutionally impermissible factor —— i.e., the defendant and the court's differing views concerning the values of certain religions —— "played a role in determining [the] sentence." See e.g., United States v. Kaba, 480 F.3d 152, 157 (2d Cir. 2007) (resentencing required because of sentencing court's reference to constitutionally impermissible factor of national origin).

## STATEMENT OF THE CASE

### PRELIMINARY STATEMENT

Ethan Melzer pleaded guilty to attempted murder of United States service members (18 U.S.C. § 1114); providing material support to terrorists (18 U.S.C. § 2339A); and transmitting defense information (18 U.S.C. § 793(d)). The offenses carried maximum prison sentences of 20, 15, and 10 years, respectively. The district court imposed the statutory maximum sentence of 45

2

years' imprisonment.

On appeal, this Court continued the Federal Defenders of New York, Inc., as counsel to Ethan Melzer.

**STATEMENT OF FACTS**

**A.    The offense**

In May 2020, 21-year-old Ethan Melzer was a private in the United States Army stationed in Vicenza, Italy. PSR at 18, 21, 34, ¶¶ 39, 51, 113.[2] He communicated via the internet with people purporting to be part of a Satanic cult with white supremacist beliefs known as the "Order of Nine Angels" or "O9A." PSR at 8, 21-25; A.31.

"O9A's ideology is centered on the worship of Satan" and the supremacy of the white race. PSR at 8, ¶17. It espouses a Satanist, "Neo-Nazi," "and pro-jihadist ideology." Id. "O9A teaches that the natural state of the world is a pagan society" in which "'survival of the fittest,'" dominates, "and that Western civilization has deviated from this natural ethos by restraining violence, embracing multiculturalism, and imposing social norms derived from Judeo-Christian beliefs." PSR at 8, ¶17. It advocates the "overthrow [of] Western civilization," "in the hopes of giving way to this purported 'natural' order of

---

[2]    "PSR" references are to the Probation Office's Presentence Investigation Report. The Report was prepared on November 4, 2022, and revised on February 13, 2023.  It includes an Addendum (PSR at 39-40) and a Sentencing Recommendation (PSR at 41-47). The PSR is Document 158 in the district court's docket sheet for the case.

3

chaos." Id.

In early May 2020, Melzer learned that his platoon would be assigned to a military base in Turkey. PSR at 21, ¶51. "By May 17, 2020, [Melzer] had informed CC-1 of the upcoming deployment." Id. at 23, ¶56. CC-1 pretended to be a veteran of the Canadian army. After Melzer's arrest, the Government determined that CC-1 was "a minor" residing in Canada and "posing [online] as a Canadian ex-paratrooper." PSR at 9, n.2. Id.

"That day," May 17, 2020, CC-1 texted Melzer that he had contacted someone in the Grey Wolves — "a Turkish far-right organization" (PSR at 23, n.21) — about staging an attack on Melzer's 40-member unit after it arrived in Turkey. PSR at 23, 29, ¶¶56, 74. Melzer responded positively, and "expanded on his belief that al Qaeda could assist" in an attack. Id. at 23, ¶56.

In the nine days between May 21 and May 29, 2020, Melzer, calling himself "'Etil Reggad' identified himself in at least two O9A ... chats as a member the U.S Army," stationed in Italy "set to depart on a deployment to Turkey." PSR at 24, ¶59.

On May 23, 2020, CC-1 forwarded four of Melzer's communications "about the proposed attack on his Platoon" to an O9A chat group "with 18 members, including [Melzer] and an FBI confidential source ('CS')." PSR at 24, ¶59. Melzer "and the group members discussed the possibility of a jihadist attack on the Platoon's deployment[.]" Id. On May 24, 2020, "CC-1 asked

4

[Melzer], 'are we literally organizing a jihadi attack[?]'
[Melzer] replied, 'And yes probably . . . as long as I get the
info I need to give you all.'" Id. ¶60 (ellipsis in PSR).

On May 25, 2020, Melzer gave CC-1 information about the
deployment, such as the number of soldiers in his platoon and how
they were armed. PSR at 25, ¶62. "Later that day, CC-1 started a
smaller, invite-only chat group on Telegram and invited vetted
participants, including MELZER, CC-3, and the CS." PSR at 25,
¶62. In a post-arrest interview, Melzer "identified [CC-3] as a
Turkish or Arab male in his 20s or 30s[.]" PSR at 27, ¶65. They
discussed giving Melzer's information "to jihadists who would
commit the attack[.]" PSR at 25, ¶62.

The discussions also shifted, away from an attack Melzer's
unit, to an attack on a supposed "replacement unit" that would
"replace [Melzer's] Platoon in several months." PSR at 25, 26-27
¶¶62, 64. And on May 26th, CC-1 wrote the group that there was
not a coherent plan, saying: "other than a really basic plan of
attack and a lot of info, we don't really have much else. And a
plan of attack doesnt work without people to ... you know, do the
attack." Dist. Ct. Docket Entry 159 at 16 (sentencing letter of
Feb. 3, 2023).

Melzer did not contact the group again until May 29, 2020.
PSR at 27, ¶66. He told CC-1 he had no additional information to
provide until he arrived in Turkey. PSR at 27-28, ¶66. This was

his last communication with CC-1. The confidential source contacted law enforcement, and Melzer was arrested on May 30, 2020. PSR at 28, ¶69. On that day, Melzer made statements to military and FBI investigators. On June 11, 2020, he was flown to the Southern District of New York and was interviewed two more times by FBI, once on the flight to the United States and again after landing in the Southern District. PSR at 28-29, ¶¶69-73.

Melzer received a "less than honorable discharge" from the Army in 2022. PSR at 34, ¶113. He was prosecuted in civilian court.

## B.    **The guilty plea**

"Superseding Indictment S1 20 CR 314 (GHW) was filed in the Southern District of New York on August 18, 2020[.]" PSR at 3, ¶1; A.30-43 (superseding indictment).

On June 24, 2022, Melzer appeared before Honorable Gregory H. Woods and pleaded guilty to three counts of the eight-count indictment: (1) attempted murder of United States service members, in violation of 18 U.S.C. § 1114 (Count Four); (2) providing and attempting to provide material support to terrorists, in violation of 18 U.S.C. § 2339A (Count Five); and (3) transmitting national defense information, in violation of 18 U.S.C. § 793(d) (Count Seven). P.2, 10-16; A.53, 61-67.[3]

---

[3] Numerals preceded by "P." and "S." refer, respectively, to the transcripts of the guilty plea allocution (on June 24, 2022) and of the sentencing proceeding (on March 3, 2023).

The parties had entered a plea agreement. A.44-51. The
agreement calculated an offense level of 43. And even though his
"Criminal History Category is I[,]" under Sentencing Guidelines §
3A1.4(b) he was in Criminal History Category VI because the
offenses involved or were intended to promote federal crimes of
terrorism. A.47. These calculations resulted in a Guidelines
range of life imprisonment. "[H]owever, because the statutorily
authorized maximum sentence for Counts Four, Five, and Seven is
540 months' imprisonment ... the applicable range is 540 months'
imprisonment[.]" Id. (citing Sentencing Guidelines § 5G1.1(a)).

The parties also agreed that "the defendant will not file a
direct appeal, nor bring a collateral challenge ... of any
sentence at or below the Stipulated Guidelines Sentence of 540
months'[.]" A.48.

During the guilty plea allocution —— on June 24, 2022 ——
the district court reviewed the plea agreement with Ethan Melzer.
P.20-21; A.71-72. It told him that, under the plea agreement,
"[y]ou've agreed not to file a direct appeal or to bring a
collateral challenge ... of any sentence at or below the
stipulated guideline sentence of 540 months' imprisonment." P.21;
A.72. Melzer said he understood the provision and was willing to
waive those rights. P.22; A.73.

The court asked Melzer what he had done that made him guilty
of the charges. P.23; A.74. He said that, in May 2020, he

7

"disclosed sensitive information about my Army unit's upcoming deployment to individuals I was communicating with on the online in the messaging app, Telegram[,]" with the intent that U.S. service members be killed. Id. Melzer added that "through the same conduct, I provided material resources knowing that they were to be used in preparation for the attempted murder of U.S. service members." Id. He said he understood that the information he disclosed "was sensitive national defense information, and that the individuals I provided it to online were not entitled to receive it." Id. He told the court: "I'm sorry, and I regret every single thing I did." Id.

C.    **The Probation Office's Guidelines calculation and Sentencing Recommendation**

The PSR states that its "guideline calculations reflect the same calculations as the plea agreement." PSR at 35, ¶124. It calculated the total offense level as 43. Id. at 30-31, ¶¶81-90. The PSR noted that Melzer had no adult convictions. Id. at 31, ¶92. But "[t]he offense involved a federal crime of terrorism; therefore, the criminal history category is VI." Id., ¶95 (citing U.S.S.G. § 3A1.4(b)).

The PSR also contained a "Sentencing Recommendation." PSR at 41-47. It recommended a downward "variance" from the Guideline term of 540 months' to a sentence of 300 months' (25 years) imprisonment. Id. at 41.

8

The PSR explained that, in making the recommendation, it was taking into account "that Melzer is a 24-year old, first-time offender facing 45 years in prison. He endured a difficult upbringing marred by reported family violence and his own reported sexual abuse victimization." PSR at 43. The PSR's recommendation added: "Our hope is that a 25-year prison term is sufficient to protect the public from further harm, to provide just punishment, and will allow Melzer to receive services to address and overcome the issues which led to his criminality, while avoiding having him spend almost all of his adult life in prison as called for by the guidelines." Id.

D. **Ethan Melzer's background and characteristics**

Before sentencing, Ethan Melzer was examined by Eric Mercer, L.C.S.W. who prepared a report about Melzer's developmental and psychosocial history. See Report of Erik Mercer, L.C.S.W., dated Jan. 31, 2023 ("Mercer Rep't"). Melzer's background and personal characteristics were also briefly discussed in the PSR. See PSR at 32-33, ¶¶99-104.

1. Personal history

Ethan Melzer was born in May 1998 in Louisville, Kentucky, the only child of "Nicholas Melzer and Julie Presley, nee Anderson." PSR at 32, ¶99. His parents separated when he was three years old, and he lived with his mother. Id.; Mercer Rep't at 3. But his mother "and her long-term boyfriend, Damon

9

Stringer, were both severe alcoholics[.]" <u>See</u> Mercer Rep't at 3.
Stringer "became belligerent when drunk and most days were
punctuated by episodes of eruptive violence." <u>Id.</u>

Melzer's childhood was thus "'chaotic as hell.'" Mercer
Rep't at 3. Ethan's father did not intervene; he remarried, and
his new wife wanted him "to focus on his new family and leave
Ethan behind." <u>Id.</u> at 3.

Ethan also grew up "in a family and community environment in
which hate was normative." Mercer Rep't at 5. His mother's "overt
racism was grounded in her grandfather's proud membership in the
Klu Klux Klan." <u>Id.</u> at 4. And Damon Stringer "spewed hatred
toward people of color, Jews and gays at any opportunity." <u>Id.</u>

"When Ethan started school, the classroom did not provide
respite from the alienation he felt at home." Mercer Rep't at 4.
As an overweight child, he was teased relentlessly. <u>Id.</u> He also
was "taunted daily and called a 'pussy' and a 'bitch'" and
"'soft.'" <u>Id.</u> "A particular source of ridicule was Ethan's love
of art and music. Ethan learned quickly that ... art and music
were considered feminine pursuits." <u>Id.</u>

So, starting as early as elementary school, "Ethan retreated
into the isolat[ed] world of internet message boards and
multi-player video games," spending about "nine hours a day
online." Mercer Rep't at 4. His "interest in ghosts and the
paranormal" led him to the "4chan message boards," where he

10

accessed videos, images of violence, "and a wide range of unmonitored, illegal content." Id.

The Neo-Nazi content "was prolific on the 4chan message boards[.]" Id. But "he was surrounded by people who espoused those same values publicly." Id. He also suffered other trauma growing up. He was sexually abused by Damon Stringer's teenage son starting at age seven and lasting several years. See Mercer Rep't at 13-14.

In middle school, he continued spending "the bulk of his free time on-line[,]" video gaming and watching "shock content on 4chan message boards" as a distraction from the "chaos of his home life[.]" Mercer Rep't at 5.

"Middle school was also a time when Ethan was becoming more aware of his homosexuality." Id. His "insecurity and self-doubt deepened as he came to terms with being gay." Mercer Rep't at 5. He "was terrified that his secret would be discovered." Id. He recalled: "'I was a total outcast. I couldn't relate to anyone....The only thing I knew for sure was, don't be gay.'" Id. at 5-6. This heightened his need "to mask his authentic self[.]" Id. at 6.

In the seventh grade, a friend offered him some marijuana, and "Ethan quickly realized that he had found the perfect mask." Mercer Rep't at 6. He did not like its effects, "but the effect it had on the way people treated him was seismic.... [A]lmost

11

instantly, he began experiencing a respect from his peers that was unprecedented." Id. "[H]e was becoming cool." Id.

Ethan Melzer's drug use coincided with his mother's increasing abuse of alcohol. "[W]hen Ethan was in the 7th grade," "she fell into a deep depression" (because of her father's death) and drank even more excessively. Mercer Rep't at 6, 7. When Ethan began smoking marijuana with friends, "his mother smoked it with him too." Id. at 6.

For Ethan, this was "a period of 'free reign.'" Mercer Rep't at 6. He "frequently stayed home and played video games during the school day." Id.

By the time he entered high school, "the only reliable communities in his life were his drug friends and his online community." Mercer Rep't at 6. By the tenth grade, he was using methamphetamine daily and dropped out of school completely at the end of the 10th grade. Id.

"Without the minimal structure offered by school attendance, Ethan's life coalesced entirely around drugs." Mercer Rep't at 7.

When he was about age 16, his mother "split with [Damon] Stringer," and she married Brian Presley who was "physically abusive toward Ms. Presley." And when Ethan Melzer attempted to intervene, Brian Presley responded violently. Eventually, "Ethan fled to the home of a friend in downtown Louisville after being brutally assaulted by Mr. Presley." Mercer Rep't at 7.

12

He remained marginally housed for about a year when he was ages 16 and 17. Mercer Rep't at 7. He worked at fast-food restaurants "and he sold drugs to pay for his deepening methamphetamine habit." Id. He became involved in dangerous situations including wounding another drug dealer using a firearm. See PSR at 10-11, ¶21 (discussing the shooting).

But around that time, he decided to stop using drugs. See Mercer Rep't at 7. He returned to his mother's home and got a job cooking and cleaning at the Shiraz restaurant in Louisville. Id. His former boss at Shiraz boss, Chris Enochs, remembers that Ethan was "'down on his luck,'" but "'always  showed up clean and appropriate and he was always pleasant. He wanted to do well. He usually had to walk four miles to and from work because his mother wouldn't drive him.'" Mercer Rep't at 7.

Enochs told Ethan Melzer about the Department of Labor's Job Corp program — a residential job training and education program for young people. See Dist. Ct. Docket Entry 157 at 8. On September 10, 2018, Ethan Melzer arrived at the Jobs Corps campus in Muhlenberg, Kentucky, where he remained for about nine or ten months until about June 2019, when he reported to the Army. See Mercer Rep't at 8; PSR at 33, ¶111. While in the Job Corp, he "obtained his high school diploma" and "specialized training as a heavy equipment operator[.]" PSR at 33-34, ¶¶111-12.

The defining characteristic of Ethan's time in Job Corps

13

"was not Neo-Nazi ideology and anti-American sentiment; it was discipline. Ethan responded well to the structure of the program and impressed his instructors and counselors with his steady preparation to enlist in the military." And he focused on physical fitness. Mercer Rep't at 9-10.

On June 14, 2019, Ethan Melzer traveled to Fort Benning, Georgia, for basic training. Mercer Rep't at 10. It was one of the best times of his life. Id. The training drills were intense. But he said: "There was always something to do and no matter how hard it was we were all in it together." Id. He "was elected by his unit to a team leader[.]" Mercer Rep't at 10.

After three months, "Ethan moved on to Airborne School at Fort Benning.... [F]ew of his fellow soldiers in basic training went on to Airborne School because it required a high physical-training score and a high Armed Services Vocational Aptitude Battery (ASVAB) test, both of which he had achieved." Mercer Rep't at 10. When he graduated, he was so positive about himself "that he worked up the courage to attend an LBGT rights rally in Atlanta," though he left quickly, fearful of being seen. See Mercer Rep't at 11.

In about September 2019, Ethan Melzer "was shipped to Camp Ederle in Vicenza, Italy." Mercer Rep't at 11; see PSR at 18, ¶39. But "his hopes for a continued sense of support and community were shattered" Mercer Rep't at 11. The people in the

14

new unit were unwelcoming. "No one from his basic training unit
had been sent to Camp Ederle and Ethan knew no one." Mercer Rep't
at 11. "The loss of support and connection was abrupt and Ethan
fell into a depression and began drinking more heavily." Id.
After the positive communal experience of basic training, he
suddenly found himself isolated and alone. "The loss was
traumatic as his tenuous sense of community and protection broke
down. Ethan regressed to a childhood state and returned to the
familiar realm of internet messaging boards. The immaturity and
distorted perceptions that characterized his earlier engagement
on Discord returned and prompted Ethan to make a series of
catastrophic decisions that led to his offense." Mercer Rep't at
11.

Also, in February 2020, the COVID-19 pandemic struck Italy.
The country's lockdowns extended to Melzer's army unit in
Vicenza. His Unit stopped training, and he languished in his
room, retreating to te internet. Dist. Ct. Docket Entry 157 at
13-14.

2.   Mitigating circumstances

"Ethan's life can be understood as a cascade of risk factors
with minimal protective factors to protect him from their toxic
impact." Mercer Rep't at 12. Growing up, he suffered recurrent
physical and emotional abuse and also contact sexual abuse. His
mother and her long-term boyfriend, Damon Stringer, were

15

alcoholics. Id. at 12-14. And he grew up in a family and social environment in which hate speech was normative. See Mercer Rep't at 14. "As an overweight, sensitive, gay boy in a hyper-masculine environment defined by intolerance[.]" Mercer Rep't at 14. "Ethan was desperate to distract others from what was at his core." Id.

In addition, his "youth at the time of the offense is an additional factor that weighs heavily on his behavior." Mercer Rep't at 14. The availability of brain imaging technology has provided new insight into the significant brain development that occurs between the ages of twelve and twenty-five. Id. "Adolescents, as a group, are less capable than adults of accurately assessing risks and rewards; controlling their impulses; and recognizing and  regulating emotional responses — in short, they are less consistent in their ability to self-regulate their behavior." Id. at 14 (citation omitted).

But "[i]n the time since the instant offense, Ethan has engaged in an earnest and thoughtful attempt to understand the dynamics that led to the offense behavior." Mercer Rep't at 16. He is now living "authentically." "Ethan has come out as a gay man to everyone in his prison unit and is widely respected and liked." See Mercer Rep't at 16. He had "spent a lifetime trying to distract the people around him from his authentic self" and retreated into the internet. Id. But the experience of "living authentically for the first time has led to an internal

16

recalibration for Ethan; ... the organizing principle of his life
is now about authenticity rather than fear, shame and secrecy."
Id. "Prison has, unexpectedly, offered Ethan an opportunity for
authentic expression for the first time in his life." The
identity he had cultivated "for acceptance in his world of
intolerance no longer has utility." Id. He has been "surprised
and delighted by his ability to find acceptance as an openly gay
man." Id.

**E.    The sentencing**

1. The parties' sentencing submissions

Defense counsel argued that a sentence of 15 years'
imprisonment was appropriate in this case, under the parsimony
clause of 18 U.S.C. § 3553(a). See Dist. Ct. Docket Entry 157, at
1-28.

The government disagreed, arguing for the imposition of the
maximum prison sentence of 45 years. See Dist. Ct. Docket Entry
159, at 1-86.

2. The sentencing proceeding

At the sentencing, on March 3, 2023, the parties again
advocated their positions on the appropriate sentence. S.9-32;
A.93-116. The court also heard victim impact statements from Army
Captain Joshua Krause, who prepared the classified and
unclassified intelligence briefings for Melzer's platoon (S.32-
36; A.116-20); and from Captain Jacob Ferris, the platoon leader.

17

S.36-42; A.120-26.

The court then pronounced the sentence. The court set forth
the 18 U.S.C. § 3553(a) factors, after which it stated that it
was going to impose a maximum sentence of 540 months' in prison.
S.42-44; A.126-28. It then turned to the justification for the
maximum sentence.

In discussing "the nature of the offense," the court
referred to Ethan Melzer's antipathy toward "Judeo-Christian
values." S.45; A.129. The court stated that Melzer's crimes were
repugnant. He had betrayed the United States and the United
States military. "All so he could achieve his nihilist goal of
undermining Judeo-Christian values and rupturing civilized
society." S.44-45; A.128-29.

The court described O9A as a Satanist, white nationalist,
pro-jihadist group that promotes using violence "to accelerate
and cause the demise of western civilization." S.45; A.129. The
court then again referenced Melzer's opposition to certain
religious values because such values benefit civilization. It
stated: "The organization [O9A] and Mr. Melzer opposed those
Judeo and Christian values because they are good for
civilization." S.45; A.129. "In [O9A's] view, as embraced by Mr.
Melzer, those values hold us back from the state of nature and
are holding us back from what it and Mr. Melzer views as the
natural order -- chaos." S.45; A.129.

18

The court noted that Melzer had tattooed himself "with a symbol for chaos, reflecting his mission to destroy western civilization to give way to satanic forces" and violence. S.45-46; A.129-30. He engaged with O9A, the court said, because he "sought out fellowship with people that shared his belief system." S.52; A.136.

### SUMMARY OF ARGUMENT

In imposing a maximum 45-year prison sentence, the court, unprompted, made comments indicating its personal views on the defendant's stance regarding the values and beliefs of certain religions. In particular, it stated that he "opposed those Judeo and Christian values" that "are good for civilization." S.45; A.129. He sought to "undermin[e] Judeo-Christian values," the court said, and thereby "ruptur[e] civilized society." S.45; A.129. At the sentencing, neither party discussed Melzer's or O9A's opposition to Judeo-Christian values.

It is impermissible for a court to punish someone for not following, for disliking, or for opposing the beliefs of any particular religion. And a court cannot incorporate the view that certain religions are "good for civilization" into its justification for the imposition of a sentence. Due process forbids the imposition of a sentence on the basis of constitutionally impermissible considerations, such as the defendant's race and national origin. United States v. Leung, 40

19

F.3d 577, 586 (2d Cir. 1994) ("A defendant's race or nationality
may play no adverse role in the administration of justice,
including sentencing"); <u>United States v. Borrero-Isaza</u>, 887 F.2d
1349, 1352-57 (9th Cir. 1989) (sentencing more harshly based on
ethnicity or national origin violates due process) (cited in
<u>Leung</u>, <u>id.</u> at 586). "While these cases focused on a defendant's
characteristics, ... similar principles apply when a judge
impermissibly takes his own religious characteristics into
account at sentencing." <u>United States v. Bakker</u>, 925 F.2d 728,
740 (4th Cir. 1991). In addition, "[t]he First Amendment forbids
the uncabined reliance on a defendant's 'abstract beliefs' at
sentencing." <u>United States v. Fell</u>, 531 F.3d 197, 228 (2d Cir.
2008) (quoting <u>Dawson v. Delaware</u>, 503 U.S. 159, 166-67 (1992);
<u>see also</u> <u>Wisconsin v. Mitchell</u>, 508 U.S. 476, 485-86 (1993) ("a
defendant's abstract beliefs, however obnoxious to most people,
may not be taken into consideration by a sentencing judge").

"[P]roof of actual bias" is not "necessary to warrant
vacatur of the sentence" under these circumstances because, even
the appearance that a sentence was based on a constitutionally
impermissible factor, requires vacatur. <u>United States v. Kaba</u>,
480 F.3d 152, 156-57 (2d Cir. 2007); <u>Leung</u>, 40 F.3d at 586 (even
the appearance of bias, rather then actual bias, is reversible
error because "justice must satisfy the appearance of justice").

Therefore, when "there is a sufficient risk that a

reasonable observer, hearing or reading the quoted remarks, might

infer, however incorrectly," that an unconstitutional factor

"played a role in determining [the] sentence," the sentence

should be vacated, and the case remanded for resentencing before

a different judge. See Leung, 40 F.3d at 587 ("the appearance of

justice is better satisfied by assigning the resentencing to a

different judge"); accord Kaba, 480 F.3d at 159 (same).

## ARGUMENT

**The sentencing court's reference to Melzer's dislike of "Judeo and Christian values" created the appearance that the length of the sentence the court imposed was affected by a constitutionally impermissible consideration, and requires that the case be remanded for sentencing.**

### 1. The appeal waiver of the plea agreement is unenforceable because the case concerns an "arguably unconstitutional" use of Melzer's opposition to certain religions, to "Judeo and Christian values," at the sentencing.

Ethan Melzer's general waiver of the right to appeal a

sentence of 540 months or below (A.48-49), does not preclude him

from raising the issue presented in this appeal.

Although a voluntary waiver of the right to appeal "a

sentence within an agreed upon guideline range is enforceable,"

United States v. Lee, 523 F.3d 104, 106 (2d Cir. 2008) (citations

and internal quotation marks omitted), this Court has held that

such waivers are invalid "when the sentence imposed was based on

constitutionally impermissible factors," such as ethnic, racial,

"or other prohibited biases." United States v. Gomez-Perez, 215
F.3d 315, 319 (2d Cir. 2000); accord United States v. Riggi, 649
F.3d 143, 147 (2d Cir. 2011) ("[W]e have voided appeal waivers
where the sentence imposed was based on unconstitutional factors
-- such as race, naturalized status, or inability to pay
restitution") (citations omitted).

A waiver of the right to appeal "does not shield from review
a sentence colorably alleged to rest upon a constitutionally
impermissible factor, such as the defendant's race or religion."
United States v. Guillen, 561 F.3d 527, 531 (D.C. Cir. 2009);
accord United States v. Cline, 27 F.4th 613, 616 (8th Cir. 2022)
(appeal waiver is unenforceable if the court "selects a sentence
based on an impermissible factor such as race or religion").

Here, the district court, in stating its justification for
the sentence it imposed, referred to Melzer's belonging to a
Satanic group and his hostility to a particular set of religious
beliefs. And the court indicated its view that "those values,"
that Melzer disliked, are "good for civilization." A.129. This
case, therefore, presents a colorable that a constitutionally
impermissible factor — religion — here, the defendant's
opposition to a particular religions that the court appeared to
value as being beneficial for civilization. The waiver of appeal,
therefore, should be deemed unenforceable.

22

## 2. **Ethan Melzer must be resentenced.**[4]

Sentencing courts traditionally have discretion to "conduct an inquiry broad in scope, largely unlimited either as to the kind of information [they] may consider, or the source from which it may come." Pepper v. United States, 562 U.S. 476, 489 (2011) (quoting United States v. Tucker, 404 U.S. 443, 446 (1972)); see also 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background . . . of a person convicted of an offense which a court of the United States may . . . consider for the purpose of imposing an appropriate sentence."). That discretion "[o]f course . . . is subject to constitutional constraints." Pepper, 562 U.S. at 489 n.8 (citing United States v. Leung, 40 F.3d 577, 586 (2d Cir. 1994)). The constitutional guarantee of due process circumscribes a court's discretion to consider matters such as religion in determining the length of the sentence. "A defendant's right to due process is violated if he is sentenced based on 'factors that are constitutionally impermissible or totally irrelevant to the sentencing process,

---

[4] Standard of review: Because a determination of whether the district court improperly considered a constitutionally impermissible factor is a pure question of law, it is reviewed de novo. See United States v. Kaba, 480 F.3d 152, 156 (2d Cir. 2007) (reviewing de novo claim court imposed based on an unconstitutional factor — "the defendant's national origin"). Although appellant did not object to the court's comments, this Court applies an exception to the contemporaneous objection rule for unobjected-to claims of unconstitutional bias at sentencing. Kaba, 480 F. 3d at 158; Leung, 40 F. 3d at 586.

23

such as for example the race, religion, or political affiliation of the defendant.'" <u>Bates v. Secretary Florida Dept. of Corrections</u>, 768 F.3d 1278, 1289 (11th Cir. 2014) (quoting <u>Zant v. Stephens</u>, 462 US. 862, 885 (1983)); <u>accord</u> <u>Deyton v. Keller</u>, 682 F.3d 340, 346 (4th Cir. 2012) ("The Supreme Court's decision in <u>Zant</u> bars a sentencing judge from relying on the religion ... of the defendant in determining the appropriate term of imprisonment") (internal quotation marks omitted).

Although the Constitution "does not require a person to surrender his or her religious beliefs upon the assumption of judicial office[,] courts ... cannot sanction sentencing procedures that create the perception of the bench as a pulpit from which judges announce their personal sense of religiosity and simultaneously punish defendants for offending it." <u>United States v. Bakker</u>, 925 F.2d 728, 740 (4th Cir. 1991).

In this case, as part of its explanation for the lengthy prison sentence it imposed, the district court made statements indicating a bias against Melzer because of his hostility to "Judeo-Christian values." S.45; A.129. The court then commented that "Judeo and Christian values" are "good for civilization." S.45; A.129. These comments would permit a reasonable observer to conclude that the district court's sentence in this case was affected by the defendant's hostility toward "Judeo and Christian values" —— values that, in the court's view, are good for

24

civilization. A reasonable observer could infer that the court was telling Melzer that one of the reasons for the lengthy was because he opposed "Judeo and Christian values." As noted, the court made a value-judgment about these religious values, saying they were "good for civilization." Because the court incorporated these statements into its justification for the sentence, an observer could infer that the defendant's dislike of a religion favored by the court affected the sentence. The comments indicated the court viewed his dislike of Judeo and Christian values as an aggravating factor in the offense.

The court's comments, therefore, created a "sufficient risk that a reasonable observer, hearing or reading the quoted remarks, might infer, however incorrectly," that Melzer's opposition to Judeo-Christian values "played a role in determining [his] sentence." See Kaba, 480 F.3d at 157 (inappropriate reference to national origin); Leung, 40 F. 3d at 5886-87 (same). The question is not whether the court actually harbored a bias toward Mr. Melzer based on his views about any particular set of religious beliefs. In Leung and Kaba, this Court was confident that the district courts in those cases "harbored no bias" based on the defendants' national origin, alien status, or any other prohibited factor. Kaba, 480 F. 3d at 158; Leung, 40 F. 3d at 586. But the Court held that the "focus of our analysis" is not "on the court's motivation[.]" Kaba, 480

25

F.3d at 158. "The creation of at least the appearance of
unfairness requires a remand for re-sentencing." Kaba, 480 F.3d
at 158.

Thus, "proof of actual bias" is not "necessary to warrant
vacatur of the sentence." Kaba, 480 F.3d at 156. This is because,
to perform its function, "justice must satisfy the appearance of
justice." Offut v. United States, 348 U.S. 11, 14 (1954); accord
Kaba, 480 F.3d at 156 (quoting United States v. Edwards-Franco,
885 F.2d 1002, 1005 (2d Cir. 1989), which in turn quotes Offut,
id. at 14). In other words, for justice to be done, it must also
appear to be done. And as a consequence, "'even the appearance
that a sentence reflects'" a district court's consideration of a
constitutionally impermissible factor in determining a
defendant's sentence "'will ordinarily require a remand for
resentencing.'" See Kaba, 480 F.3d at 156 (quoting Leung, 40 F.3d
at 586); United States v. Fiore, 381 F.3d 89, 96-97 (2d Cir.
2004).

Additionally, the creation of this appearance of unfairness
requires that the sentence be vacated and the case remanded to a
different judge. Kaba, 480 F.3d at 159 ("the better course is to
remand to a different judge for re-sentencing as a matter of
course, irrespective of whether there was actual bias or reason
to think that bias in th[e] particular case was perceived");
Leung, 40 F.3d at 587 (despite Circuit's confidence the district

26

court was not biased, "the appearance of justice is better satisfied by assigning to a different judge"); <u>see</u> <u>also</u> <u>United States v. Aine</u>, 386 Fed. App'x 16, 22 (2d Cir. 2010)(same).

### **CONCLUSION**

The Court should vacate Ethan Melzer's sentence and remand the case for resentencing by a different district judge.

Dated:     New York, New York
           July 5, 2023

                         Respectfully submitted,

                         FEDERAL DEFENDERS OF NEW YORK, INC.
                            APPEALS BUREAU

                    By: _*Darrell Fields*_____
                         **DARRELL FIELDS**
                         Attorney for Defendant-Appellant
                            **ETHAN PHELAN MELZER**
                         52 Duane Street, 10th Floor
                         New York, New York 10007
                         Tel.: (212) 417-8742

27

### CERTIFICATE OF SERVICE

I certify that a copy of this Brief has been served by CM/ECF on the United States Attorney/S.D.N.Y.; Attention: **SAM ADELSBERG, ESQ.**, Assistant United States Attorney, One St. Andrew's Plaza, New York, New York 10007.

Dated:     New York, New York
           July 5, 2023


*Darrell Fields*
**DARRELL FIELDS**
Assistant Federal Defender

28

---

### CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.  This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because:

>   this brief contains 5,924 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because:

>   this brief has been prepared in a monospaced typeface using **Corel WordPerfect X6** with **12 characters per inch in courier new** type style.

Attorney for Appellant **ETHAN PHELAN MELZER**

Dated:   New York, New York
         July 5, 2023

*Darrell Fields*
————————————————————
**DARRELL FIELDS**
Assistant Federal Defender

29