**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

**Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500**

**MOTION INFORMATION STATEMENT**

Docket Number(s): 23-6247 _____   _____ Caption [use short title]

Motion for: Dismissal of Appeal

_____

_____

Set forth below precise, complete statement of relief sought:

Motion to dismiss the appeal brought by defendant-

appellant Ethan Phelan Melzer based on Melzer's

knowing and voluntary waiver of his appellate rights

in this case.

US v. Ethan Phelan Melzer

_____

_____

MOVING PARTY: United States of America        OPPOSING PARTY: Ethan Phelan Melzer

☐ Plaintiff        ☐ Defendant

☐ Appellant/Petitioner   ☑ Appellee/Respondent

MOVING ATTORNEY: Damian Williams, U.S. Attorney, Southern District of New York    OPPOSING ATTORNEY: Federal Defenders of New York, Inc. Appeals Bureau

[name of attorney, with firm, address, phone number and e-mail]

By: Matthew J.C. Hellman, Assistant U.S. Attorney     By: Darrell Fields, Esq.

One Saint Andrew's Plaza, New York, NY 10007     52 Duane Street, 10th Floor, New York, NY 10007

(212) 637-2278; Email: matthew.hellman@usdoj.gov     (212) 417-8742; Email: darrell_fields@fd.org

Court- Judge/ Agency appealed from: The Honorable Gregory H. Woods, United States District Judge, Southern District of New York

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes   ☐ No (explain):_____
_____

Opposing counsel's position on motion:
☐ Unopposed   ☑ Opposed   ☐ Don't Know
Does opposing counsel intend to file a response:
☑ Yes   ☐ No   ☐ Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has this request for relief been made below?   ☐ Yes ☐ No
Has this relief been previously sought in this court?   ☐ Yes ☐ No
Requested return date and explanation of emergency: _____
_____
_____
_____
_____

Is oral argument on motion requested?   ☐ Yes ☑ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?   ☐ Yes ☑ No If yes, enter date:_____

Signature of Moving Attorney:

/s/ Matthew Hellman _____ Date: 10/04/2023 _____ Service by: ☑ CM/ECF   ☐ Other [Attach proof of service]

Form T-1080 (rev.12-13)

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| | : |
| UNITED STATES OF AMERICA, | : |
| Appellee, | : |
| - v. - | : |
| ETHAN PHELAN MELZER, also known as Etil Reggad, | : |
| Defendant-Appellant. | : |

**<u>AFFIRMATION</u>**

Docket No. 23-6247

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| STATE OF NEW YORK | ) |
| COUNTY OF NEW YORK | : ss.: |
| SOUTHERN DISTRICT OF NEW YORK | ) |

MATTHEW J.C. HELLMAN, pursuant to 28 U.S.C. § 1746, hereby declares under penalty of perjury:

1.     I am an Assistant United States Attorney in the Office of Damian Williams, United States Attorney for the Southern District of New York. I represented the Government in the proceedings in the District Court, and I represent the Government in this appeal. I submit this affirmation in support of the Government's motion to dismiss this appeal brought by defendant-appellant Ethan Phelan Melzer based on Melzer's knowing and voluntary waiver of his appellate rights in this case.

1

## PRELIMINARY STATEMENT

2.       Melzer appeals from a judgment of conviction entered on March 6, 2023 in the United States District Court for the Southern District of New York, by the Honorable Gregory H. Woods, United States District Judge, following Melzer's guilty plea.

3.       Superseding Indictment S1 20 Cr. 314 (GHW) (the "Indictment") was filed on August 18, 2020, in eight counts. Count One charged Melzer with conspiracy to murder U.S. nationals, in violation of 18 U.S.C. §§ 2332(b) and 3238. Count Two charged Melzer with attempting to murder U.S. nationals, in violation of §§ 2332(b), 3238, and 2. Count Three charged Melzer with conspiracy to murder U.S. service members, in violation of 18 U.S.C. §§ 1114, 1117, and 3238. Count Four charged Melzer with attempting to murder U.S. service members, in violation of 18 U.S.C. §§ 1114, 3238, and 2. Count Five charged Melzer with providing and attempting to provide material support to terrorists, in violation of 18 U.S.C. §§ 2339A(a), 3238, and 2. Count Six charged Melzer with conspiring to murder and maim in a foreign country, in violation of 18 U.S.C. §§ 956(a)(1) & (a)(2)(A) and 3238. Count Seven charged Melzer with the illegal transmission of national defense information, in violation of 18 U.S.C. §§ 793(d) and 2. Count Eight charged Melzer with the illegal delivery of national defense information in violation of 18 U.S.C. §§ 794(a) and 2.

4.     On June 24, 2022, Melzer appeared before Judge Woods, withdrew his previous plea of not guilty, and pleaded guilty, pursuant to a plea agreement, to Counts Four, Five, and Seven of the Indictment. In the plea agreement, Melzer stipulated, *inter alia*, that he would not appeal a term of imprisonment of 540 months or less.

5.     On March 3, 2023, Judge Woods sentenced Melzer principally to a term of 540 months' imprisonment.

6.     On March 10, 2023, Melzer filed a notice of appeal. On July 5, 2023, Melzer filed a brief claiming that his sentence is procedurally unreasonable.

7.     Melzer is serving his sentence.

## STATEMENT OF FACTS

**A.     The Offense Conduct**

8.     Melzer, a member of the Order of the Nine Angles, or "O9A," a neo-Nazi, Satanist, pro-jihadist group, used his membership in the U.S. Army to plot the murder of his fellow U.S. servicemembers. In 2020, Melzer joined a platoon training for an overseas deployment, and began sharing classified information to facilitate a "mascal"—or mass casualty—jihadist attack on his own unit while it was deployed. (PSR ¶¶ 59–63).[1]

---

[1] "PSR" and "Presentence Report" refer to the revised Presentence Investigation Report, dated May 10, 2023, prepared by the United States Probation Office (the

9. O9A teaches that the natural essence of the world is chaos, humanity's purported "natural" state. (PSR ¶ 17). O9A aims to restore this state by accelerating the demise of Western civilization, which, it instructs, has deviated from this natural ethos by restraining violence, embracing multiculturalism, and imposing social norms derived from Judeo-Christian beliefs. (*Id.*). The group elevates Nazi Germany as a model society and admires Adolf Hitler. (*Id.*). It advocates "culling," a form of human sacrifice, to wipe out Jews, people of color, and others deemed to be inferior under O9A's Social Darwinist views. (*Id.*). O9A embraces terrorism—including Islamist jihadist ideology and the violent tactics of jihadist groups. (*Id.*).

10. As part of its effort to dismantle civilization, O9A instructs its members to fulfill "sinister" deeds, including "insight roles," in which they attempt to infiltrate various organizations, including the military, to gain training and experience in violent tactics, commit acts of violence, identify and recruit like-minded individuals, and ultimately subvert those groups. (*Id.*). Members publish texts to promote O9A's violent mission, and also maintain various encrypted methods of communication by which its followers communicate with each other. (*Id.*). One such platform is Telegram, where O9A members have maintained a channel dedicated to an O9A cell called the "RapeWaffen Division." (*Id.*).

---

"Probation Office") in connection with Melzer's sentencing; "Br." refers to Melzer's brief on appeal; and "A." refers to the appendix filed with that brief.

11.    Melzer extensively researched and discussed O9A's ideology, and maintained and shared a large library of O9A texts. (PSR ¶ 30). In a March 2019 chat, Melzer said his purpose was, "General chaos." (PSR ¶ 29). He tattooed himself with a distinctive design symbolizing "chaos." (PSR ¶ 31). In a Telegram chat on April 21, 2020, Melzer asserted his belief that "fascism is more the law of nature than anything, [my] world view is that by causing absolute chaos, anarchy, whatever you want to call it, the law of nature will naturally take over once again." (PSR ¶ 48).

12.    In June 2019, Melzer began Army basic training. (PSR ¶ 38). Consistent with O9A directives, Melzer secretly maintained his affiliation with O9A while in the Army. (PSR ¶ 37). As he trained to become an airborne paratrooper, he acquired, and hid, a physical copy of a seminal O9A text, "The Sinister Tradition," which he carried with him during his service. (PSR ¶ 38). After completing basic training, Melzer deployed to Camp Ederle, a joint Italian-American military complex in Vicenza, Italy and obtained security clearances. (PSR ¶ 39).

13.    In early May 2020, the Army reassigned Melzer to a platoon scheduled for a classified foreign deployment (the "Platoon"), where the Platoon would be guarding an isolated and sensitive military installation (the "Military Base") in Turkey. (PSR ¶ 51). Over the next month, Melzer and his platoonmates received extensive training and classified and unclassified information regarding the Military Base, including briefings about the geography, layout, security, and the sensitive

5

purpose of the Military Base; its strategic importance to U.S. national security; and specific attack scenarios, including attacks involving jihadist forces. (PSR ¶ 58).

14.    On May 23, 2020, in an O9A chat group titled "Order of Nine Rapes" with 18 members, including an FBI confidential source (the "CS"), Melzer wrote that he was a U.S. servicemember stationed in Vicenza who was "[g]oing to Turkey for a deployment" and that a "date and time [for the deployment] will be given soon." (PSR ¶ 59). Melzer and the group members discussed what he proposed: a jihadist attack on the Platoon's deployment. (*Id.*). Melzer explained the vulnerabilities he could reveal would make the attack a "mascal," or "mass casualty," event. (*Id.*).

15.    On May 24, 2020, a conspirator organizing others in the chatrooms to share Melzer's information ("CC-1") asked Melzer, "are we literally organizing a jihadi attack[?]" Melzer replied, "And yes probably…as long as I get the info I need to give you all." (PSR ¶ 60). Agreeing he might die in the proposed attack, Melzer wrote, "Who gives a fuck…the after effects of a convoy getting attacked would cover it…it would be another war…I would've died successfully…cause if another 10 year war in the Middle East would definitely leave a mark." (*Id.*).

16.    On May 25, 2020, Melzer revealed more sensitive information and explicitly discussed an attack on the Platoon: "40 people [in the convoy] that are actual soldiers…small arms…for all [I know] so far [the vehicles] could just be busses." (PSR ¶ 62). Melzer also proposed an attack on the Military Base itself, and

noted, "[e]very fire-team [would be] essentially crippled," and that there would be no "Carl Gustavs/at4s"—anti-armor weapons that can also be used against enemy personnel or fortified positions. (*Id.*). Melzer further revealed that the Military Base had no "mg's or 320s"—machine guns and grenade launchers—"so they'll be severely underpowered to a force that would [have] mgs rpgs [rocket-propelled grenades] and whatever else." (*Id.*). Melzer explained he could take and send photographs of the Military Base to facilitate attack planning, and to "[e]xpect more when I get there." (PSR ¶ 64).

17.     On May 29, 2020, after Melzer reaffirmed his commitment to the attack on the Military Base, the CS asked Melzer why he thought he could "actually get away with" the attack. Melzer responded, "because I fly under the radar already act completely normal around other people outside and don't talk about my personal life or beliefs with anyone." (PSR ¶ 66).

18.     On May 30, 2020, military investigators took Melzer into custody as the Platoon waited to board buses to the airport en route to the Military Base. (PSR ¶ 69). In Melzer's bag, packed for deployment, were O9A texts; in Melzer's phone, he had drafted—but had yet to send—lengthy responses to CC-1 affirming the depth of his ideological commitment to O9A. (*Id.*).

## B.    The Plea Agreement and the Guilty Plea

19.     On June 24, 2022, Melzer appeared before Judge Woods and pled

guilty, pursuant to a written plea agreement with the Government (the "Plea Agreement"), to Counts Four, Five, and Seven of the Indictment. (PSR ¶ 11).

20. The Plea Agreement contained a stipulation between the parties as to the application of the United States Sentencing Guidelines ("Guidelines") to Melzer's offenses. The parties stipulated that the applicable offense level was 43 and that Melzer's Criminal History Category was VI, resulting in a Guidelines range of life imprisonment. (A. 45-47). However, because the statutory maximum sentence for Counts Four, Five, and Seven is 540 months' imprisonment, the applicable Guidelines sentence was 540 months' imprisonment (the "Stipulated Guidelines Sentence"). (A. 47).

21. In the Plea Agreement, Melzer also agreed that he would "not file a direct appeal . . . of any sentence within or below the Stipulated Guidelines Sentence of 540 months' imprisonment." (A. 48). Melzer further "agree[d] not to appeal . . . any term of supervised release that is less than or equal to the statutory maximum," "any fine that is less than or equal to $500,000," or "any special assessment that is less than or equal to $300." (A. 48-49).

22. On June 24, 2022, Melzer appeared before Judge Woods and entered a guilty plea to Counts Four, Five, and Seven of the Indictment pursuant to the Plea Agreement. (A. 52-84). Judge Woods conducted a careful and thorough hearing that complied with Federal Rule of Criminal Procedure 11.

23.     At the outset of the proceeding, after placing Melzer under oath, Judge Woods established that Melzer was competent to plead guilty. (A. 54-57). Judge Woods also confirmed that Melzer had had sufficient opportunity to confer with his counsel about his case, his defenses, and the Plea Agreement, and that Melzer was satisfied with his attorney's representation. (*Id.*).

24.     Judge Woods then explained the rights that Melzer would give up by pleading guilty, including his rights: to plead not guilty; to a speedy and public jury trial where he would be presumed innocent and the Government would bear the burden of proving his guilt beyond a reasonable doubt; to the assistance of counsel, including appointed counsel if necessary, at trial and at every other stage of the proceedings; to confront and cross-examine witnesses; to testify, present evidence, and compel the attendance of witnesses; and against compelled self-incrimination. (A. 57-61). Melzer confirmed that he understood the rights he would give up by pleading guilty. (A. 61).

25.     Before accepting Melzer's guilty plea, Judge Woods also ensured that Melzer was advised of the elements of the crimes to which he was pleading guilty, and the Government described each of the elements of Counts Four, Five, and Seven. (A. 61-64).

26.     Judge Woods then explained to Melzer the possible penalties for these crimes, including the maximum terms of imprisonment and supervised release, for

9

each of Counts Four, Five, and Seven. (A. 64-67).

27.    Melzer confirmed that he had read the Plea Agreement, discussed it with his counsel, and understood its contents. (A. 69-74). Melzer also confirmed that he had entered into the Plea Agreement freely and voluntarily, and that no promises had been made other than what was set forth in the agreement. (A. 73-74).

28.    Judge Woods confirmed that Melzer understood that the Plea Agreement included a Stipulated Guidelines Sentence of 540 months' imprisonment. (A. 71-72). Judge Woods then directed Melzer's attention to the appellate waiver provision of the Plea Agreement. (A. 71-73). Judge Woods advised Melzer, "You've agreed not to file a direct appeal . . . of any sentence at a or below the stipulated guideline sentence of 540 months' imprisonment." (A. 72). Judge Woods asked, "do you understand the rights to appeal or otherwise challenge your conviction and sentence that you have waived in your plea agreement?" (A. 73). Melzer responded: "Yes, I do, Judge." (A. 73). Judge Woods then asked: "And are you willing to waive those rights?" (*Id*.). Melzer responded: "Yes, Judge." (*Id*.).

29.    Judge Woods then ensured that an adequate factual basis supported Melzer's plea. Asked to describe what he did to make him guilty of the crimes, Melzer responded: "At a time in May 2020, with the intent that U.S. service members be killed, I disclosed sensitive information about my Army unit's upcoming deployment to individuals I was communicating with on the online in the messaging

10

app, Telegram. And through the same conduct, I provided material resources knowing that they were to be used in preparation for the attempted murder of U.S. service members. And, finally, I understood that the information I disclosed was sensitive national defense information, and that the individuals I provided it to online were not entitled to receive it." (A. 74).

30.     Judge Woods found that a factual basis supported the plea; that Melzer understood his rights; and that Melzer was pleading guilty freely and voluntarily, with an understanding of the possible penalties that could be imposed. Accordingly, Judge Woods accepted the plea. (A. 74-80).

## C.     The Sentencing Proceeding

31.     In the Presentence Report, the Probation Office, consistent with the Plea Agreement, determined that the Guidelines sentence was 540 months' imprisonment. (PSR ¶¶ 79-90, 122-24).

32.     On March 12, 2020, Melzer appeared before Judge Woods for sentencing. Judge Woods conducted a sentencing proceeding that complied with Federal Rule of Criminal Procedure 32. In a letter submitted to the District Court regarding a disagreement about the time of Melzer's affiliation with O9A, the parties agreed that the difference was immaterial to the Guidelines and did not require a *Fatico* hearing. Neither Melzer nor the Government otherwise objected to the Presentence Report's factual statements, and Judge Woods adopted the Presentence

11

Report's facts as the Court's findings of fact. (A. 90). Judge Woods determined, in agreement with the parties and the Probation Office, that the advisory Guidelines sentence was 540 months' imprisonment. (A. 93).

33.     Judge Woods then heard arguments from counsel with respect to the appropriate sentence. (A. 93-116). Melzer asked Judge Woods to impose a below-Guidelines sentence of 180 months' imprisonment. (A. 100-01). Melzer argued that this substantial downward variance was appropriate under 18 U.S.C. § 3553(a) for several reasons, including that a 180-month sentence was "long" and would "place [Melzer] on a long period of supervision when he is released." (*Id*.).

34.     The Government asked Judge Woods to impose a Guidelines sentence of 540 months' imprisonment. (A. 103). The Government cited the fact that Melzer had threatened lives, placed servicemen and servicewomen in continued danger due to his distribution of national defense information, and provided material support to terrorists by his conduct. The Government also highlighted the ways in which O9A appeared to have provided the motive for Melzer's crimes, but noted, "[t]o be absolutely clear, the defendant is not being sentenced for his beliefs, his worldview, or even his advocacy for it." (A. 114).

35.     Judge Woods also invited Melzer to speak on his own behalf, and he did so. (A. 101). Judge Woods then heard statements from two victims of Melzer's offenses. (A. 116-26).

36.     After hearing from the parties, Judge Woods considered the Section 3553(a) factors. (A. 126-28). In imposing sentence, Judge Woods noted that Melzer: "betrayed the United States of America. He betrayed the United States military. He targeted for murder his fellow soldiers. He worked to aid jihadist terrorists. All so he could achieve his nihilist goal of undermining Judeo-Christian values and rupturing civilized society." (A. 128–29). Judge Woods then explained O9A's goals. "[I]t is a white nationalist, neo-Nazi, satanist, pro-jihadist group that promotes the use of extreme violence to accelerate and cause the demise of western civilization." (A. 129). He continued:

> *In its view, as embraced by Mr. Melzer*, those values hold us back from the state of nature and are holding us back from what it and Mr. Melzer views as the natural order -- chaos. *The organization and Mr. Melzer* opposed those Judeo and Christian values because they are good for civilization. His crimes were committed in order to destroy civilization, to bring us back to a state of nature.

(A. 129) (emphases added). Judge Woods emphasized that, "[a]s counsel for the United States described, [Melzer] is not charged here with his ideology." (A. 130). Judge Woods stressed that Melzer's crime began only when he went to Italy and not when he began adhering to extremist ideology or researching O9A. (A. 129).

37.     Judge Woods then described Melzer's efforts to plan an attack on his platoon. Melzer "sought to provoke jihadi terrorists to commit the attack" while the platoon was on its deployment. (A. 130). Melzer "provided national defense

13

information to others intending that it be used to murder the members of his platoon by the jihadi fighters. [Melzer] strategized about the best ways to attack his unit, and to kill the 40 or so service people in it." (A. 131).

38. Judge Woods commented on Melzer's history and characteristics. He had a "chaotic childhood," his mother suffered from alcoholism, and he felt a sense of "alienation and difference from the culture that surrounded him" due to his sexuality. (A. 132-33). Melzer's home life was "[s]uffused with racist, homophobic, and anti-Semitic views." (A. 132). He turned to selling drugs and violent activity, and at one point shot and wounded someone during a drug transaction. (A. 133). He told someone that he robbed stores with members of a gang. (*Id.*). Melzer abused drugs himself, at various times using marijuana, ecstasy, Xanax, and meth. (A. 134).

39. Considering deterrence under Section 3553(a)(2)(B), Judge Woods concluded that he does not believe Melzer is remorseful for his actions. (A. 135). Judge Woods stated that "[p]art of the methodology of [O9A], as I understand it, is that one should hide one's true intention and commitment to better achieve its goals." (*Id.*). It appeared to the judge that Melzer could be doing that here, "[s]o I do not trust his expression of remorse or that he has truly renounced his commitment to violence. . . . I think it is more likely that [Melzer] is playing another role to obtain leniency from the Court, as he played soldier while working in secret to murder servicemen." (A. 136). Judge Woods was concerned that Melzer was hiding his

14

views from the court just as he hid them from his pre-military employer and from his platoonmates. (A. 135-36).

40.    Judge Woods then sentenced Melzer to 540 months' imprisonment, which he concluded was "sufficient, but not greater than necessary" to comply with the purposes of sentencing. (A. 142-43). Judge Woods also imposed a term of supervised release and a special assessment, neither of which Melzer challenges on appeal. (A. 141-43).

## ARGUMENT

### Melzer's Appeal Should Be Dismissed Because He Knowingly and Voluntarily Waived His Right to Appeal

41.    In this appeal, Melzer argues that the District Court committed procedural error at sentencing by making remarks that Melzer claims created the appearance that his sentence was based on his constitutionally protected beliefs. (Br. 21-27). This challenge is barred by the Plea Agreement's appellate waiver, which is valid on its face and into which Melzer entered knowingly and voluntarily. Accordingly, his appeal should be dismissed pursuant to the waiver.

### A.    Applicable Law

42.    This Court has repeatedly held that waivers of the right to appeal are typically valid and enforceable. *See, e.g.*, *United States v. Coston*, 737 F.3d 235, 237 (2d Cir. 2013); *United States v. Riggi*, 649 F.3d 143, 147 (2d Cir. 2011); *United States v. Lee*, 523 F.3d 104, 106 (2d Cir. 2008). Although such waivers are not

15

always enforceable, the circumstances under which this Court will decline to enforce a waiver are limited. *See United States v. Gomez-Perez*, 215 F.3d 315, 319 (2d Cir. 2000) ("The[] exceptions to the presumption of the enforceability of a waiver . . . occupy a very circumscribed area of our jurisprudence."). As this Court has explained, the exceptions include situations "when the waiver was not made knowingly, voluntarily, and competently, when the sentence was imposed based on constitutionally impermissible factors, such as ethnic, racial or other prohibited biases, when the government breached the plea agreement, or when the sentencing court failed to enunciate any rationale for the defendant's sentence." *Id.* (citations omitted).

43.    The knowing and voluntary nature of the waiver can be established by demonstrating that during the plea hearing, the defendant's attention was drawn to the waiver provision in the plea agreement. *See United States v. DeJesus*, 219 F.3d 117, 121 (2d Cir. 2000) (rejecting defendant's assertion that he did not knowingly waive his right to appeal in his plea agreement because that contention was inconsistent with his statements during the plea colloquy). An "unpreserved challenge to an appeal waiver" is subject to review only for plain error. *United States v. Cook*, 722 F.3d 477, 479 (2d Cir. 2013). To establish plain error, a "defendant must demonstrate that there is a reasonable probability that, but for the error, he would not have entered the plea." *Id.* at 481 (citation and quotation marks omitted).

16

**B.    Discussion**

44.    In the Plea Agreement, Melzer expressly waived his right to appeal a sentence at or below the Stipulated Guidelines Sentence of 540 months' imprisonment. During his plea proceeding, Melzer affirmed that he had read the Plea Agreement, discussed it with his attorney, and understood its contents. (A. 69-74). Melzer also confirmed his understanding that the Plea Agreement contained a Stipulated Guidelines Sentence of 540 months' imprisonment. (A. 71-72). Finally, Judge Woods specifically ensured that Melzer understood that he was waiving his right to appeal a sentence of 540 months or less. (A. 72-73). Thus, Melzer's waiver was knowing and voluntary. Because Judge Woods ultimately imposed a sentence of 540 months' imprisonment, plainly within the range Melzer agreed not to challenge on appeal, Melzer's appeal is barred by the appellate waiver and should be dismissed. *See, e.g.*, *United States v. Pearson*, 570 F.3d 480, 485 (2d Cir. 2009) ("[I]n no circumstance may a defendant, who has secured the benefits of a plea agreement and knowingly and voluntarily waived the right to appeal a certain sentence, then appeal the merits of a sentence conforming to the agreement." (quotation marks and ellipses omitted)).

45.    Melzer nevertheless contends that the appellate waiver should not be enforced in this case. Melzer argues that the appellate waiver is unenforceable with respect to his contention that the District Court erred when it "made a value-

17

judgment about . . . religious values" and made remarks that "indicated the court viewed [Melzer's] dislike of Judeo and Christian values as an aggravating factor in the offense" for his sentence. (Br. 25). Notably, however, a defendant seeking to invoke an exception to the enforceability of appeal waivers must first make a sufficient showing on the merits of that claimed exception. Melzer admits as much, conceding that he must present at least a "colorable" claim to avoid the waiver. (Br. 22). In fact, this Court requires not just a colorable claim, but a meritorious one. For example, this Court has "reject[ed] the notion that an appeal waiver becomes unenforceable simply because a defendant 'claims' . . . ineffective assistance of counsel," holding that "if the record on appeal shows that that claim lacks merit, the appeal should be dismissed because the waiver should be enforced." *United States v. Monzon,* 359 F.3d 110, 118-19 (2d Cir. 2004). To avoid the waiver, the defendant must show that "the claim that the waiver was the result of ineffective assistance of counsel *was meritorious.*" *Id.* at 119 (emphasis added). "If the rule were otherwise, a defendant who secured the benefits of a plea agreement by, *inter alia*, knowingly and voluntarily waiving the right to appeal could escape the fairly bargained-for appeal waiver by the simple expedient of asserting an ineffective-assistance-of-counsel claim that had no merit." *Id.* The logic of *Monzon* applies with equal force here.

46.     Melzer has not made the requisite showing to establish his claimed

18

exception. While "[t]the First Amendment forbids the uncabined reliance on a defendant's 'abstract beliefs' at sentencing," a sentencing judge may consider "evidence of beliefs or associational activities, so long as they are relevant to prove, for example, motive or aggravating circumstances, to illustrate future dangerousness, or to rebut mitigating evidence." *United States v. Fell*, 531 F.3d 197, 228 (2d Cir. 2008) (quoting *Dawson v. Delaware*, 503 U.S. 159, 166–67 (1992)); *accord Wisconsin v. Mitchell*, 508 U.S. 476, 485-86 (1993) (defendant's beliefs may be relevant to sentencing judge's consideration of defendant's motive or aggravating factors); *United States v. Stewart*, 686 F.3d 156, 167 (2d Cir. 2012) (sentencing judge properly "determine[d] the characteristics of the defendant . . . through the contents of statements she voluntarily and publicly made"); *United States v. Kane*, 452 F.3d 140, 143 (2d Cir. 2006) (affirming sentencing court's consideration of defendant's writings, which "rebutted his mitigating evidence" and showed "the increased likelihood of recidivism or a lack of recognition of the gravity of the wrong"). Assuming that an appeal waiver may not be enforced when a sentence violates these principles (which this Court has not held but may assume for purposes of this motion), Melzer has not shown, as he must in order to avoid enforcement of the waiver, a meritorious claim (or even a colorable one).

47.    The District Court fashioned a sentence to "reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense,

afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant." (A. 126-28). The record shows that Judge Woods, in explaining his sentence, particularly noted that Melzer "[was] not charged here with his ideology. His crime began after his unit was transferred to Italy." (A. 130). The statements to which Melzer objects were plainly made by Judge Woods while reciting the background of the offenses, and providing context for Melzer's crimes. Judge Woods then explicitly disclaimed that Melzer was being sentenced in any way based on Melzer's beliefs, or Melzer's opposition to the beliefs of others.

48.    The evidence Judge Woods considered was highly "'relevant to the issues involved' in the sentencing proceeding," including to understand Melzer's motive for the crimes and to rebut Melzer's mitigation arguments. *Kane*, 452 F.3d at 142 (quoting *Dawson*, 503 U.S. at 164). It would have been difficult to establish Melzer's motive without discussing his commitment to O9A's ideology. Melzer took that ideology seriously: he once said that his overall goal was "general chaos," and he received a tattoo symbolizing that concept. (PSR ¶¶ 29, 31). Melzer hoped that an attack on the Military Base would draw the U.S. into a conflict in the Middle East, thereby advancing O9A's aims of accelerating the overthrow of Western civilization and replacing it with the "natural" order of chaos. (PSR ¶¶ 17, 60). O9A teaches that Judeo-Christian values foster social norms that buttress Western civilization, which stands in the way of chaos. (PSR ¶ 17). This is what Judge Woods

meant when saying that Melzer targeted his fellow soldiers and aided jihadist terrorists "[a]ll so he could achieve his nihilistic goal of undermining Judeo-Christian values and rupturing civilized society." (A. 129). In other words, Judge Woods was simply describing the facts of the offenses, which were also recited in the Presentence Report to which Melzer did not object.

49.    There is no basis to infer from the District Court's statements that it was sentencing Melzer because of his "abstract beliefs." Indeed, defense counsel failed to object to Judge Woods's remarks during the hearing, illustrating their reasonableness. Melzer contorts the record to argue that Judge Woods "indicat[ed] a bias against Melzer because of his hostility to 'Judeo-Christian values.'" (Br. 24). The sentencing transcript plainly shows that Judge Woods was summarizing the internal logic of O9A when he mentioned Judeo-Christian values. Judge Woods stated that he would make only brief comments about O9A's worldview. He then reviewed the organization's goals and strategy as Melzer understood them:

> *In its view, as embraced by Mr. Melzer*, those values hold us back from the state of nature and are holding us back from what it and Mr. Melzer views as the natural order -- chaos. *The organization and Mr. Melzer* opposed those Judeo and Christian values because they are good for civilization. His crimes were committed in order to destroy civilization, to bring us back to a state of nature.

(A. 129) (emphases added). Judge Woods clearly did not make a "value-judgment" when he said that "Judeo and Christian values . . . are good for civilization." (Br. 25).

In fact, the transcript does not reveal what Judge Woods thinks about Judeo-Christian values. It shows only his understanding of O9A's aims and roadmap: O9A seeks chaos and the state of nature; civilization is the opposite of chaos; Judeo-Christian values sustain—or "are good for"—civilization; therefore O9A adherents, including Melzer, should oppose those values. Nothing in Judge Woods's remarks "create[d] the perception of the bench as a pulpit" from which he impermissibly "announce[d his] personal sense of religiosity." *United States v. Bakker*, 925 F.2d 728, 740 (4th Cir. 1991).

50.     The District Court carefully explained that Melzer was charged and sentenced not for any constitutionally protected beliefs or affiliations that he had held for years before joining the Army and deploying, but for his conduct in Italy: transmitting national defense information, helping terrorists, and trying to kill his fellow soldiers. Judge Woods permissibly considered Melzer's views to the extent they were "relevant to the issues involved in the sentencing proceeding." *Kane*, 452 F.3d at 142 (quotation marks omitted). Accordingly, because "the record on appeal shows that [Melzer's] claim lacks merit," his knowing and voluntary appellate waiver, in exchange for which he received substantial benefits, should be enforced, and his appeal should be dismissed. *Monzon*, 359 F.3d at 119.

## CONCLUSION

51.     For the foregoing reasons, Melzer's waiver of his right to appeal should

be given effect, and his appeal should be dismissed.[2]


Dated:        New York, New York
              October 4, 2023


                              /s/ Matthew Hellman
                              Matthew J.C. Hellman
                              Assistant United States Attorney
                              Southern District of New York
                              Telephone: (212) 637-2278

---

[2] Should the Court deny this motion, the Government respectfully requests that it be permitted to file a brief within 60 days of the date of entry of the order denying the motion.

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this motion complies with the type-volume limitation of the Federal Rules of Appellate Procedure. As measured by the word processing system used to prepare this motion, there are 5,196 words in this motion.

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By:    Matthew J.C. Hellman
Assistant United States Attorney
(212) 637-2278