# 23-6247

*To Be Argued By*:
MATTHEW J.C. HELLMAN

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket No. 23-6247

━━━◆◆◆◆━━━

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

ETHAN PHELAN MELZER, also known as Etil Reggad,

*Defendant-Appellant.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

DAMIAN WILLIAMS,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*
26 Federal Plaza, 37th Floor
New York, New York 10278
(212) 637-2200

SAMUEL ADELSBERG,
MATTHEW J.C. HELLMAN,
KIMBERLY RAVENER,
JAMES LIGTENBERG,
*Assistant United States Attorneys,
Of Counsel.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . .  2

    A.  The Offense Conduct . . . . . . . . . . . . . . . . . .  2

    B.  The Plea Agreement and Guilty Plea . . . . .  7

    C.  The Sentencing . . . . . . . . . . . . . . . . . . . . . .  9

    D.  The Government's Motion to Dismiss . . . .  14

ARGUMENT:

POINT I—Melzer's Appeal Should Be Dismissed
    Because He Knowingly and Voluntarily Waived
    His Right to Appeal . . . . . . . . . . . . . . . . . . . . .  14

POINT II—Melzer's Sentence Was Procedurally
    Reasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  16

        1.  Standard of Review . . . . . . . . . . . . . . .  16

        2.  Mention of a Defendant's Beliefs at
           Sentencing . . . . . . . . . . . . . . . . . . . . . .  17

    B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  19

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

ii

PAGE

# TABLE OF AUTHORITIES

*Cases*:

*Dawson v. Delaware,*
    503 U.S. 159 (1992). . . . . . . . . . . . . . . . . . . . . 18, 24

*Offut v. United States,*
    348 U.S. 11 (1954). . . . . . . . . . . . . . . . . . . . . . 26

*Pepper v. United States,*
    562 U.S. 476 (2011). . . . . . . . . . . . . . . . . . . . . 17

*United States v. Bakker,*
    925 F.2d 728 (4th Cir. 1991) . . . . . . . . . . . . . . . . 21

*United States v. Carreto,*
    583 F.3d 152 (2d Cir. 2009) . . . . . . . . . . . . . . . . 26

*United States v. Cavera,*
    550 F.3d 180 (2d Cir. 2008) . . . . . . . . . . . . . . . . 16

*United States v. Dussard,*
    967 F.3d 149 (2d Cir. 2020) . . . . . . . . . . . . . . . . 17

*United States v. Edwardo-Franco,*
    885 F.2d 1002 (2d Cir. 1989) . . . . . . . . . . . . . . . . 18

*United States v. Fell,*
    531 F.3d 197 (2d Cir. 2008) . . . . . . . . . . . . *passim*

*United States v. Jones,*
    No. 22-2958, slip op. (2d Cir. Apr. 29,
    2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25

*United States v. Kaba,*
    480 F.3d 152 (2d Cir. 2007) . . . . . . . . . . 18, 24, 25

iii

PAGE

*United States v. Kane*,
    452 F.3d 140 (2d Cir. 2006) . . . . . . .   18, 22, 23, 24

*United States v. Leung*,
    40 F.3d 577 (2d Cir. 1994) . . . . . . . .   18, 19, 24, 25

*United States v. Marcus*,
    560 U.S. 258 (2010). . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. McIntosh*,
    753 F.3d 388 (2d Cir. 2014) . . . . . . . . . . . . . . . . 16

*United States v. Pearson*,
    570 F.3d 480 (2d Cir. 2009) . . . . . . . . . . . . . . . . 15

*United States v. Samet*,
    200 F. App'x 15 (2d Cir. 2006) . . . . . . . .   17, 20, 23

*United States v. Stewart*,
    686 F.3d 156 (2d Cir. 2012) . . . . . . . . . . . . . . . . 18

*United States v. Tarricone*,
    996 F.2d 1414 (2d Cir. 1993) . . . . . . . . . . . . . . . 26

*United States v. Verkhoglyad*,
    516 F.3d 122 (2d Cir. 2008) . . . . . . . . . . . . . . 16, 19

*United States v. Villafuerte*,
    502 F.3d 204 (2d Cir. 2007) . . . . . . . . . . . . . . . . 17

*Wisconsin v. Mitchell*,
    508 U.S. 476 (1993). . . . . . . . . . . . . . . .   18, 22, 23

iv

PAGE

*Statutes, Rules & Other Authorities:*

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S.S.G. § 1B1.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 23-6247

––––––––––––

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

ETHAN PHELAN MELZER, also known as Etil Reggad,

*Defendant-Appellant.*

––––––––––––

## BRIEF FOR THE UNITED STATES OF AMERICA

––––––––––––

### Preliminary Statement

Ethan Phelan Melzer appeals from a judgment of conviction entered on March 6, 2023, in the United States District Court for the Southern District of New York, by the Honorable Gregory H. Woods, United States District Judge, following Melzer's guilty plea.

Superseding Indictment S1 20 Cr. 314 (GHW) (the "Indictment") was filed on August 18, 2020, in eight counts. Count One charged Melzer with conspiring to murder U.S. nationals, in violation of 18 U.S.C. §§ 2332(b) and 3238. Count Two charged Melzer with attempting to murder U.S. nationals, in violation of 18 U.S.C. §§ 2332(b), 3238, and 2. Count Three charged

2

Melzer with conspiring to murder U.S. service members, in violation of 18 U.S.C. §§ 1114, 1117, and 3238. Count Four charged Melzer with attempting to murder U.S. service members, in violation of 18 U.S.C. §§ 1114, 3238, and 2. Count Five charged Melzer with providing and attempting to provide material support to terrorists, in violation of 18 U.S.C. §§ 2339A(a), 3238, and 2. Count Six charged Melzer with conspiring to murder and maim in a foreign country, in violation of 18 U.S.C. §§ 956(a)(1), 956(a)(2)(A), and 3238. Count Seven charged Melzer with illegally transmitting national defense information, in violation of 18 U.S.C. §§ 793(d) and 2. Count Eight charged Melzer with illegally delivering national defense information, in violation of 18 U.S.C. §§ 794(a) and 2.

On June 24, 2022, Melzer pled guilty before Judge Woods, pursuant to a plea agreement with the Government, to Counts Four, Five, and Seven of the Indictment. In the plea agreement, Melzer stipulated, among other things, that he would not appeal a term of imprisonment of 540 months or less.

On March 3, 2023, Judge Woods sentenced Melzer principally to a term of 540 months' imprisonment.

Melzer is serving his sentence.

## Statement of Facts

### A.  The Offense Conduct

Melzer is a member of the Order of the Nine Angles ("O9A")—a violent, white supremacist, neo-Nazi, Satanist, pro-jihadist group—who used his membership in the U.S. Army to plot the murder of his fellow U.S.

3

servicemembers. (PSR ¶¶ 17-18, 59–68).[1] After joining a platoon that was training for an overseas deployment, Melzer shared classified information to facilitate a mass-casualty jihadist attack on his own unit. (PSR ¶¶ 59-63).

O9A teaches that the natural essence of the world is chaos, humanity's purported "natural" state. (PSR ¶ 17). O9A aims to restore this state by accelerating the demise of Western civilization, which, it instructs, has deviated from this natural chaos by embracing multiculturalism, restraining violence (such as rape and murder), and imposing social norms (such as opposition to rape and murder) derived from Judeo-Christian values. (PSR ¶ 17). Members of O9A believe in the inevitability of a global race war and seek to move civilization closer to that war through disruptive violence and chaos. (PSR ¶ 17). The group elevates Nazi Germany as a model society and admires Adolf Hitler. (PSR ¶ 17). It advocates "culling," a form of human sacrifice, to wipe out Jews, people of color, and others deemed to be inferior under O9A's Social

_____

[1]    "PSR" or "Presentence Report" refers to the revised Presentence Investigation Report, dated May 10, 2023, prepared by the United States Probation Office (the "Probation Office") in connection with Melzer's sentencing; "Br." refers to Melzer's brief on appeal; "A." refers to the appendix filed with that brief; and "App. Dkt." refers to an entry on this Court's docket for this case. Unless otherwise noted, case text quotations omit internal quotation marks, citations, footnotes, and previous alterations.

4

Darwinist views. (PSR ¶ 17). O9A embraces terrorism —including Islamist jihadist ideology and the violent tactics of jihadist groups. (PSR ¶ 17). It also advocates rape as a means of asserting dominance, breaking social norms, and propagating the expansion of the so-called white race. (PSR ¶ 17).

As part of its effort to dismantle civilization, O9A instructs its members to fulfill "sinister" deeds, including "insight roles," in which members attempt to infiltrate various organizations, including the military, to gain training and experience in violent tactics, commit acts of violence, identify and recruit like-minded individuals, and ultimately subvert those organizations from within. (PSR ¶ 17). Members publish texts to promote O9A's violent mission. (PSR ¶ 17). They also maintain various encrypted methods of communication, which members use to communicate with each other. (PSR ¶ 17). One such platform is Telegram, where O9A members have maintained a channel dedicated to an O9A cell called the "RapeWaffen Division." (PSR ¶ 17).

Melzer extensively researched and discussed O9A's ideology, and maintained and shared a large library of O9A texts. (PSR ¶ 30). In a March 2019 chat, Melzer said his purpose was "[g]eneral chaos." (PSR ¶ 29). He tattooed himself with a distinctive design symbolizing "chaos." (PSR ¶ 31). In a Telegram chat on April 21, 2020, Melzer asserted his belief that "fascism is more the law of nature than anything, [my] world view is that by causing absolute chaos, anarchy, whatever you want to call it, the law of nature will naturally take over once again." (PSR ¶ 48).

5

In June 2019, Melzer began Army basic training. (PSR ¶ 38). Consistent with O9A directives, Melzer secretly maintained his affiliation with O9A while in the Army. (PSR ¶ 37). As he trained to become an airborne paratrooper, he acquired and hid a physical copy of a seminal O9A text, "The Sinister Tradition," which he carried with him during his service. (PSR ¶ 38). After completing basic training, Melzer deployed to a military complex in Italy and obtained security clearances. (PSR ¶ 39).

In early May 2020, the Army reassigned Melzer to a platoon scheduled for a classified foreign deployment, during which the platoon would be guarding an isolated and sensitive military base in Turkey. (PSR ¶ 51). Over the next month, Melzer and his platoonmates received extensive training and classified information about the military base, including briefings about the geography, layout, security, and sensitive purpose of the military base; its strategic importance to U.S. national security; and specific attack scenarios, including attacks involving jihadist forces. (PSR ¶ 58).

On May 23, 2020, in an O9A chat group titled "Order of Nine Rapes," Melzer wrote that he was a U.S. servicemember stationed in Italy who was "[g]oing to Turkey for a deployment" and that a "date and time [for the deployment] will be given soon." (PSR ¶ 59). Melzer proposed that he and the other members of the group coordinate a jihadist attack on his platoon. (PSR ¶ 59). Melzer explained that, due to his insider knowledge, he could reveal vulnerabilities that would make the attack a "mascal" (mass-casualty) event. (PSR ¶ 59).

6

The next day, a co-conspirator who was organizing others in O9A chatrooms to share Melzer's information asked Melzer, "are we literally organizing a jihadi attack[?]" (PSR ¶ 60). Melzer replied, "yes probably . . . as long as I get the info I need to give you all." (PSR ¶ 60). After agreeing that he might die in the proposed attack, Melzer wrote, "Who gives a fuck . . . the after effects of a convoy getting attacked would cover it . . . it would be another war . . . I would've died successfully . . . cause . . . another 10 year war in the Middle East would definitely leave a mark." (PSR ¶ 60).

On May 25, 2020, Melzer revealed additional, highly sensitive information in the chat group and explicitly discussed an attack on his platoon. He wrote, for example: "40 people [in the convoy] that are actual soldiers . . . small arms . . . for all [I know] so far [the vehicles] could just be busses." (PSR ¶ 62). Melzer also proposed an attack on the military base itself, noting that "[e]very fire-team [would be] essentially crippled" and that there would be no anti-armor weapons to use against enemy personnel or fortified positions. (PSR ¶ 62). Melzer further revealed that the military base had no machine guns or grenade launchers, "so they'll be severely underpowered to a force that" had those weapons. (PSR ¶ 62). Melzer explained that he would take and send photographs of the military base to facilitate attack planning and to "[e]xpect more" information from him once he got there. (PSR ¶ 64).

A few days later, after Melzer reaffirmed his commitment to the attack on his platoon, a co-conspirator asked Melzer why he thought he could "actually get away with" the attack. (PSR ¶ 66). Melzer responded,

7

"because I fly under the radar already act completely normal around other people outside and don't talk about my personal life or beliefs with anyone." (PSR ¶ 66).

On May 30, 2020, military investigators took Melzer into custody as his platoon waited to board buses to the airport en route to the military base. (PSR ¶ 69). In Melzer's bag, packed for deployment, were O9A texts. (PSR ¶ 69). In Melzer's phone, he had drafted—but had yet to send—lengthy statements to a co-conspirator affirming the depth of his ideological commitment to O9A. (PSR ¶ 69).

A grand jury in the Southern District of New York subsequently returned an indictment charging Melzer with eight counts, including terrorism offenses, attempted murder, murder conspiracy, and illegal transmission of national defense information. (A. 30-43).

## B.   The Plea Agreement and Guilty Plea

On June 24, 2022, Melzer appeared before Judge Woods and pled guilty, pursuant to a plea agreement, to three counts: (1) attempting to murder U.S. service members, in violation of 18 U.S.C. §§ 1114, 3238, and 2 (Count Four); (2) providing and attempting to provide material support to terrorists, in violation of 18 U.S.C. §§ 2339A(a), 3238, and 2 (Count Five); and (3) illegally transmitting national defense information, in violation of 18 U.S.C. §§ 794(a) and 2 (Count Seven). (PSR ¶ 11).

The plea agreement contained a stipulation between the parties as to the application of the United States Sentencing Guidelines to Melzer's offenses. The

8

parties stipulated that the applicable offense level was 43 and that Melzer's Criminal History Category was VI, resulting in a Guidelines range of life imprisonment. (A. 45-47). However, because the statutory maximum sentence for Counts Four, Five, and Seven was 540 months' imprisonment, the applicable Guidelines sentence was also 540 months' imprisonment. (A. 47). In the plea agreement, Melzer explicitly agreed that he would "not file a direct appeal . . . of any sentence within or below the Stipulated Guidelines Sentence of 540 months' imprisonment." (A. 48).

At the plea hearing, Melzer confirmed that he had read the plea agreement, discussed it with his counsel, and understood its contents. (A. 69-74). Melzer also confirmed that he had entered into the plea agreement freely and voluntarily, and that no promises had been made other than what was set forth in the agreement. (A. 73-74).

Judge Woods confirmed that Melzer understood that the plea agreement included a stipulated Guidelines sentence of 540 months' imprisonment. (A. 71-72). Judge Woods then directed Melzer's attention to the appellate waiver provision of the plea agreement. (A. 71-73). Judge Woods advised Melzer, "You've agreed not to file a direct appeal . . . of any sentence at or below the stipulated guideline sentence of 540 months' imprisonment." (A. 72). Judge Woods asked, "do you understand the rights to appeal or otherwise challenge your conviction and sentence that you have waived in your plea agreement?" (A. 73). Melzer responded: "Yes, I do, Judge." (A. 73). Judge Woods then

9

asked: "And are you willing to waive those rights?" (A. 73). Melzer responded: "Yes, Judge." (A. 73).

Judge Woods then asked Melzer to describe what he did that made him guilty of the crimes charged in Counts Four, Five, and Seven. Melzer acknowledged that he "disclosed sensitive information about [his] Army unit's upcoming deployment" with individuals on Telegram, "with the intent that U.S. service members be killed." (A. 74). "And through the same conduct," Melzer continued, he provided material support to terrorists "in preparation for the attempted murder of U.S. service members." (A. 74). Melzer also admitted his knowledge that the information he disclosed "was sensitive national defense information" that he was not allowed to share. (A. 74).

Melzer does not challenge any aspect of the plea proceeding on appeal.

## C. The Sentencing

In advance of sentencing, the Probation Office prepared the Presentence Report. Consistent with the plea agreement, the Presentence Report determined that the Guidelines sentence was 540 months' imprisonment. (PSR ¶¶ 79-90, 122-24). In describing the ideology of O9A, the Presentence Report explained, "O9A teaches that the natural essence of the world is a pagan society dominated by unbridled 'survival of the fittest,' and that Western civilization has deviated from this natural ethos by," among other things, restraining violence and "imposing social norms derived from Judeo-Christian beliefs." (PSR ¶ 17). Melzer did not

10

object to the Presentence Report's reference to O9A's opposition to Judeo-Christian values. (*See* PSR p. 39).

On March 12, 2020, Melzer appeared before Judge Woods for sentencing. At the sentencing hearing, Melzer confirmed that he had no objections to the factual statements in the Presentence Report—including the reference to O9A's opposition to Judeo-Christian values. (A. 88-89). Judge Woods therefore adopted the Presentence Report's facts as the Court's findings of fact. (A. 90). Judge Woods also determined, in agreement with the parties and the Probation Office, that the advisory Guidelines sentence was 540 months' imprisonment. (A. 93).

Judge Woods then heard arguments from counsel with respect to the appropriate sentence. (A. 93-116). Melzer asked Judge Woods to impose a below-Guidelines sentence of 180 months' imprisonment. (A. 100-01). Melzer argued that this substantial downward variance was appropriate under 18 U.S.C. § 3553(a) for several reasons, including that a 180-month sentence was "long" and would "place [Melzer] on a long period of supervision when he is released." (A. 100-01).

The Government asked Judge Woods to impose a Guidelines sentence of 540 months' imprisonment. (A. 103). The Government cited the fact that Melzer had threatened lives, placed servicemen and servicewomen in continued danger due to his distribution of national defense information, and provided material support to terrorists. The Government also highlighted the ways in which O9A provided the motive for Melzer's crimes, but noted, "[t]o be absolutely clear,

11

the defendant is not being sentenced for his beliefs, his worldview, or even his advocacy for it." (A. 114).

Judge Woods also invited Melzer to speak on his own behalf, and he did so. (A. 101). Judge Woods then heard statements from two Army captains who described the immense harm Melzer caused to his fellow servicemembers and to the Army generally. (A. 116-26).

After hearing from the parties, Judge Woods considered the Section 3553(a) factors. (A. 126-28). In imposing sentence, Judge Woods described Melzer's offense conduct, noting that Melzer: "betrayed the United States of America. He betrayed the United States military. He targeted for murder his fellow soldiers. He worked to aid jihadist terrorists. All so he could achieve his nihilist goal of undermining Judeo-Christian values and rupturing civilized society." (A. 128-29). Judge Woods then explained O9A's goals. "[I]t is a white nationalist, neo-Nazi, satanist, pro-jihadist group that promotes the use of extreme violence to accelerate and cause the demise of western civilization." (A. 129). He continued:

> *In its view, as embraced by Mr. Melzer*, those values hold us back from the state of nature and are holding us back from what it and Mr. Melzer views as the natural order—chaos. *The organization and Mr. Melzer* opposed those Judeo and Christian values because they are good for civilization. His crimes were committed in order to destroy civilization, to bring us back to a state of nature.

12

(A. 129) (emphases added). Judge Woods largely tracked the Presentence Report's description of Melzer's offense conduct, including by mentioning Melzer's and O9A's antipathy to Judeo-Christian beliefs because of their perception that such beliefs are foundational to Western civilization and society. (*See, e.g.*, PSR ¶ 17).

After describing the framework within which Melzer committed his crimes, Judge Woods emphasized that, "[a]s counsel for the United States described, [Melzer] is not charged here with his ideology." (A. 130). Judge Woods stressed that Melzer's crime began only when he went to Italy and not when he began adhering to extremist ideology or researching O9A. (A. 129).

Judge Woods then described Melzer's efforts to plan an attack on his platoon. Melzer "sought to provoke jihadi terrorists to commit the attack" while the platoon was on its deployment. (A. 130). He "provided national defense information to others intending that it be used to murder the members of his platoon by the jihadi fighters. [Melzer] strategized about the best ways to attack his unit, and to kill the 40 or so service people in it." (A. 131).

Judge Woods commented on Melzer's history and characteristics. Melzer had a "chaotic childhood," his mother suffered from alcoholism, and he felt a sense of "alienation and difference from the culture that surrounded him" due to his sexuality. (A. 132-33). Melzer's home life was "[s]uffused with racist, homophobic, and anti-Semitic views." (A. 132). He turned to selling drugs and violent activity, and at one point shot

13

and wounded someone during a drug transaction, causing the victim to lose full use of his arm. (A. 133). He told someone that he robbed stores with members of a gang. (A. 133). Melzer also abused drugs, including methamphetamine, ecstasy, Xanax, and marijuana. (A. 134).

Considering deterrence under Section 3553(a)(2)(B), Judge Woods concluded that he did not believe Melzer was remorseful for his actions. (A. 135). Judge Woods stated that "[p]art of the methodology of [O9A], as I understand it, is that one should hide one's true intention and commitment to better achieve its goals." (A. 135). It appeared to the judge that Melzer could be doing that here, "[s]o I do not trust his expression of remorse or that he has truly renounced his commitment to violence. . . . I think it is more likely that [Melzer] is playing another role to obtain leniency from the Court, as he played soldier while working in secret to murder servicemen." (A. 136). Judge Woods was concerned that Melzer was hiding his views from the court just as he hid them from his pre-military employer and from his platoonmates. (A. 135-36).

Finally, Judge Woods emphasized the importance of "impos[ing] a sentence that will protect the public" from future crimes by Melzer. (A. 136-17). Given Melzer's "desire to commit murder and terrorist acts, and his violent nature," Judge Woods explained, "I'm very concerned for the safety of the community should he choose to recidivate." (A. 136).

Judge Woods then sentenced Melzer to 540 months' imprisonment, which he concluded was "sufficient, but not greater than necessary" to comply with the

14

purposes of sentencing. (A. 140-43). He also imposed a term of supervised release and a special assessment, neither of which Melzer challenges on appeal. (A. 141-43). Judge Woods asked counsel whether they knew "of any legal reason why this sentence [should] not be imposed as stated," and Melzer's counsel responded, "No, your Honor." (A. 142).

### D.   The Government's Motion to Dismiss

Melzer appealed and filed a brief claiming that his sentence was procedurally unreasonable. (App. Dkt. 17). On October 4, 2023, the Government moved to dismiss Melzer's appeal, arguing that it is barred by the provision in the plea agreement waiving Melzer's right to appeal any sentence less than or equal to 540 months' imprisonment. (App. Dkt. 21). On February 27, 2024, a motions panel of this Court deferred action on the Government's motion to dismiss and referred the motion to the merits panel. (App. Dkt. 28).

### A R G U M E N T

### POINT I

### Melzer's Appeal Should Be Dismissed Because He Knowingly and Voluntarily Waived His Right to Appeal

Melzer argues that the District Court committed procedural error at sentencing by making remarks that Melzer claims created the appearance that his sentence was based on his constitutionally protected beliefs. (Br. 21-27). As the Government argued at

15

length in its motion to dismiss (*see* App. Dkt. 21), this challenge is barred by the plea agreement's appellate waiver, which is valid on its face and which Melzer entered into knowingly and voluntarily.

In short, in the plea agreement, Melzer expressly waived his right to appeal any sentence at or below the stipulated Guidelines sentence of 540 months' imprisonment. (A. 48). During the plea proceeding, Melzer confirmed his understanding that he was waiving his right to appeal a sentence of 540 months' imprisonment or less. (A. 72-73). Because Judge Woods ultimately imposed a sentence of 540 months' imprisonment, plainly within the range Melzer agreed not to challenge on appeal, Melzer's appeal is barred by the appellate waiver and should be dismissed. (*See* App. Dkt. 21 (Government motion to dismiss)); *see also, e.g.*, *United States v. Pearson*, 570 F.3d 480, 485 (2d Cir. 2009) ("[I]n no circumstance may a defendant, who has secured the benefits of a plea agreement and knowingly and voluntarily waived the right to appeal a certain sentence, then appeal the merits of a sentence conforming to the agreement.").

## POINT II

### Melzer's Sentence Was Procedurally Reasonable

Melzer's argument that Judge Woods committed procedural error at sentencing is also meritless. Judge Woods did not, as Melzer claims, sentence Melzer for his opposition to Judeo-Christian values. As the record makes clear, Judge Woods mentioned Judeo-Christian values when reciting the background of the offenses and summarizing the internal logic of O9A. The Court

16

was permitted to accurately describe the violent belief system that motivated Melzer to commit his crimes and that makes him an ongoing danger to the public. And Judge Woods made absolutely clear that Melzer was being sentenced for his conduct, not his ideology.

## A.  Applicable Law

### 1.  Standard of Review

Appellate review of a district court's sentence "encompasses two components: procedural review and substantive review." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). "Procedural error occurs in situations where, for instance, the district court miscalculates the Guidelines; treats them as mandatory; does not adequately explain the sentence imposed; does not properly consider the § 3553(a) factors; bases its sentence on clearly erroneous facts; or deviates from the Guidelines without explanation." *United States v. McIntosh*, 753 F.3d 388, 394 (2d Cir. 2014).

When a defendant does not raise a procedural objection at the time of sentencing, the sentence is reviewed for plain error. *United States v. Verkhoglyad*, 516 F.3d 122, 128, 133 (2d Cir. 2008). To show plain error, a defendant must establish that "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Marcus*, 560 U.S. 258, 262 (2010). "[R]eversal for plain error should be used

17

sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Villafuerte*, 502 F.3d 204, 209 (2d Cir. 2007). The burden to establish plain error is on the appellant. *United States v. Dussard*, 967 F.3d 149, 156 (2d Cir. 2020).

## 2. Mention of a Defendant's Beliefs at Sentencing

Sentencing courts generally have discretion to "conduct an inquiry broad in scope, largely unlimited either as to the kind of information [they] may consider, or the source from which it may come." *Pepper v. United States*, 562 U.S. 476, 489 (2011). A sentencing judge must consider, among other factors, "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), and "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence," *id.* § 3661; *see also* U.S.S.G. § 1B1.4 ("the court may consider, without limitation, any information concerning the background, character, and conduct of the defendant, unless otherwise prohibited by law").

"[A] passing reference to a defendant's religious background is not sufficient to warrant a remand for resentencing." *United States v. Samet*, 200 F. App'x 15, 22 (2d Cir. 2006). While "[t]he First Amendment forbids the uncabined reliance on a defendant's 'abstract beliefs' at sentencing," a sentencing judge may

18

consider "evidence of beliefs or associational activities, so long as they are relevant to prove, for example, motive or aggravating circumstances, to illustrate future dangerousness, or to rebut mitigating evidence." *United States v. Fell*, 531 F.3d 197, 228 (2d Cir. 2008) (quoting *Dawson v. Delaware*, 503 U.S. 159, 166–67 (1992)); *accord Wisconsin v. Mitchell*, 508 U.S. 476, 485-86 (1993) (defendant's beliefs may be relevant to sentencing judge's consideration of defendant's motive or aggravating factors); *United States v. Stewart*, 686 F.3d 156, 167 (2d Cir. 2012) (sentencing judge properly "determine[d] the characteristics of the defendant . . . through the contents of statements she voluntarily and publicly made"); *United States v. Kane*, 452 F.3d 140, 142-43 (2d Cir. 2006) ("A sentencing court may consider" "evidence regarding the defendant's beliefs or associational activity" "so long as it is relevant to the issues involved in the sentencing proceeding.").

In a separate line of cases, this Court has held that "race and nationality should play no adverse role in the administration of justice." *United States v. Edwardo-Franco*, 885 F.2d 1002, 1005 (2d Cir. 1989); *see also United States v. Kaba*, 480 F.3d 152 (2d Cir. 2007); *United States v. Leung*, 40 F.3d 577, 586–87 (2d Cir. 1994). These cases do not hold that *any* mention of nationality is necessarily inappropriate at sentencing. *See Leung*, 40 F.3d at 587 ("mere passing references to the defendant's nationality . . . are not sufficient grounds for vacating a defendant's sentence"). Instead, "[i]t has long been settled in this Circuit that" "reference to national origin and naturalized status is permissible during sentence," as "long as it does not become the basis for determining the sentence." *Kaba*,

19

480 F.3d at 156. In this context, this Court will reverse where there is "a sufficient risk that a reasonable observer, hearing or reading the quoted remarks, might infer, however incorrectly, that [the defendant's] ethnicity and alien status played a role in determining [the defendant's] sentence." *Leung*, 40 F.3d at 586-87.

### B.  Discussion

Because Melzer did not object to Judge Woods's comments "at the time of sentencing, the sentence is reviewed for plain error." *Verkhoglyad*, 516 F.3d at 128, 133; *see also, e.g.*, *Fell*, 531 F.3d at 227-31 (applying plain error standard to claim of improper reliance on defendant's "interest in satanism" and "Native American and Muslim religions"). In any event, Melzer's claim fails under any standard of review because Judge Woods did not err at all, let alone plainly err. Contrary to Melzer's assertions, Judge Woods did not sentence him—or appear, to a reasonable observer, to sentence him—based on his constitutionally protected beliefs.

As the record makes clear, Judge Woods appropriately sentenced Melzer based on the factors set out in 18 U.S.C. § 3553(a). In explaining the reasons for the sentence he imposed, Judge Woods discussed, at length, the seriousness of Melzer's offense, Melzer's history and characteristics, and the need for the sentence to promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public. (A. 126-41).

Although Judge Woods referenced Judeo-Christian values at sentencing, he did so only in passing while

20

reciting the background of the offenses. Judge Woods largely tracked the description of the offense conduct in the Presentence Report—to which Melzer did not object—including its statement that "O9A teaches that . . . Western civilization has deviated" from the natural ethos of chaos by restraining violence and "imposing social norms derived from Judeo-Christian values." (PSR ¶ 17; *see* PSR p. 39; A. 129). Because Judge Woods was simply describing the facts of the offenses "in passing," *Samet*, 200 F. App'x at 22, there is no basis to infer that he was sentencing Melzer because of his "abstract beliefs," *Fell*, 531 F.3d at 228.

Melzer contorts the record to argue that Judge Woods "indicat[ed] a bias against Melzer because of his hostility to 'Judeo-Christian values.'" (Br. 24). The sentencing transcript plainly shows that Judge Woods was summarizing the internal logic of O9A when he mentioned Judeo-Christian values. Judge Woods stated that he would make only brief comments about O9A's worldview. (A. 129). He then reviewed the organization's goals and strategy as Melzer understood them, stating, "*in its view, as embraced by Mr. Melzer*, those values hold us back from the state of nature and are holding us back from what it and Mr. Melzer views as the natural order—chaos." (A. 129 (emphasis added)). Judge Woods then continued to describe the views of O9A and Melzer, explaining, "*The organization and Mr. Melzer* opposed those Judeo and Christian values because they are good for civilization," and "[h]is crimes were committed in order to destroy civilization, to bring us back to a state of nature." (A. 129 (emphasis added)).

21

Judge Woods clearly did not make a "value-judgment" when he said that "Judeo and Christian values . . . are good for civilization." (Br. 25). As demonstrated by the surrounding context, Judge Woods was simply describing the view of *O9A and Melzer* that Judeo-Christian values sustain civilization (which they oppose) by restraining violence and averting chaos. (*See* A. 128-29). In fact, the transcript does not reveal what Judge Woods himself thinks about Judeo-Christian values. It shows only his understanding of O9A's aims and roadmap: O9A seeks chaos and the state of nature; civilization is the opposite of chaos; Judeo-Christian values sustain—or "are good for"— civilization; and, therefore, O9A's adherents, including Melzer, oppose those values. Nothing in Judge Woods's remarks "create[d] the perception of the bench as a pulpit" from which he impermissibly "announce[d his] personal sense of religiosity." *United States v. Bakker*, 925 F.2d 728, 740 (4th Cir. 1991).

Moreover, lest there by any doubt, Judge Woods explicitly stated that he was not sentencing Melzer based on his ideological beliefs. At the sentencing hearing, the Government noted, "[t]o be absolutely clear, the defendant is not being sentenced for his beliefs, his worldview, or even his advocacy for it." (A. 114). Judge Woods then echoed the same point in explaining the reasons for his sentence, stating: "As counsel for the United States described, he is not charged here with his ideology. His crime began after his unit was transferred to Italy." (A. 130). As Judge Woods explained, Melzer was not being sentenced for the beliefs he had held for years before joining the Army and deploying, but instead for his conduct in Italy: transmitting

22

national defense information, helping terrorists, and trying to kill his fellow soldiers. (*See* A. 130). And there is no basis in the record to conclude that Judge Woods was anything but forthright when he disclaimed reliance on Melzer's ideology in choosing the appropriate sentence.

Furthermore, it was perfectly appropriate for Judge Woods to mention O9A's teachings insofar as they were "relevant to the issues involved in the sentencing proceeding," *Kane*, 452 F.3d at 142, including to show Melzer's motive, *Fell*, 531 F.3d at 228 (sentencing judge may consider beliefs where they are relevant to show motive); *Mitchell*, 508 U.S. at 485-86 (same); *Kane*, 452 F.3d at 143 (same). Melzer's devotion to O9A's ideology helped explain his motive for committing his crimes. Melzer took that ideology seriously: he once said that his overall goal was "general chaos," and he received a tattoo symbolizing that concept. (PSR ¶¶ 29, 31). Melzer hoped that an attack on the military base would draw the United States into a conflict in the Middle East, thereby advancing O9A's aims of accelerating the overthrow of Western civilization and replacing it with the "natural" order of chaos. (PSR ¶¶ 17, 60). O9A teaches that Judeo-Christian values (such as respect for human life) foster social norms that buttress Western civilization, which stands in the way of chaos. (PSR ¶ 17). This is what Judge Woods meant when saying that Melzer targeted his fellow soldiers and aided jihadist terrorists "[a]ll so he could achieve his nihilistic goal of undermining Judeo-Christian values and rupturing civilized society." (A. 129). There was nothing improper about Judge Woods describing the motive for Melzer's

23

crimes. *See Fell*, 531 F.3d at 228; *Mitchell*, 508 U.S. at 485-86; *Kane*, 452 F.3d at 143.

This Court's recent decision in *United States v. Jones* is in accord. *See* No. 22-2958, slip op. (2d Cir. Apr. 29, 2024). In *Jones*, the defendant pled guilty to terrorism-related charges based on his conduct assisting al-Shabaab, an Islamist military organization. On appeal, the defendant argued that "the district court impermissibly rel[ied] on the religiously motivated nature of al-Shabaab's attacks in imposing sentence," including by criticizing al-Shabaab for targeting Christians in particular. *Id.* at 16. This Court disagreed, explaining, "[t]o the contrary, the district court noted undisputed facts about the sectarian nature of al-Shabaab's attacks and considered these facts in weighing the sentencing factors," which "was entirely appropriate." *Id.* at 16-17. "Moreover," the Court continued, "consideration of racial or religious motivations of a crime is distinct from improper consideration of a defendant's race or religion alone, and thus is not improper when imposing a sentence." *Id.* at 17. "In short," this Court held, "the district court did not abuse its discretion in considering the extraordinarily violent and sectarian nature of al-Shabaab's terrorism at Jones's sentencing." *Id.* at 17-18. Likewise, here, it was "entirely appropriate" for Judge Woods to mention "the extraordinarily violent and sectarian nature" of O9A's ideology—including its opposition to Judeo-Christian values—in considering Melzer's motive.

O9A's ideology, as embraced by Melzer, was also relevant at sentencing "to illustrate" Melzer's "future dangerousness." *Fell*, 531 F.3d at 228; *see also Kane*,

24

452 F.3d at 142-43 (judge may consider "defendant's beliefs or associational activity" to "illustrate future dangerousness or potential recidivism"); *Dawson*, 503 U.S. at 166 ("associational evidence might serve a legitimate purpose in showing that a defendant represents a future danger to society," especially where the defendant is a member "in an organization that endorses the killing of any identifiable group"). Melzer's ideological commitment to O9A—a group that opposes Western values by advocating the rape and mass murder of Jews, people of color, and others deemed inferior, PSR ¶ 17—plainly bears on "the need for the sentence imposed . . . to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). As Judge Woods explained, Melzer's "desire to commit murder and terrorist acts" on behalf of O9A makes him a tremendous danger to society upon his release from prison. (A. 136-37). In weighing Melzer's "future dangerousness," *Fell*, 531 F.3d at 228, Judge Woods was permitted to consider Melzer's devotion to an organization that endorses violence, *see Kane*, 452 F.3d at 142-43; *Dawson*, 503 U.S. at 166.

Melzer's argument to the contrary relies heavily on *Kaba* and *Leung*, but those cases are inapposite. Both cases involved an appearance of bias based on ethnicity and nationality, not the defendant's beliefs. *See Kaba*, 480 F.3d at 156; *Leung*, 40 F.3d at 585. And "[i]n both cases, the district court referred to the publicity a sentence might receive in the defendant's ethnic community or native country and explicitly stated its intention to seek to deter others sharing that national origin from violating United States laws in the future." *Kaba*, 480 F.3d at 157; *see id.* at 156 (district court

25

wanted to send a message to "people coming here from Guinea"); *Leung*, 40 F.3d at 585 (purpose of sentence was "to generally deter others, particularly others in the Asiatic community," by showing that "if people want to come to the United States they had better abide by our laws").

By contrast, here, Judge Woods did not make any comments about Melzer's ethnicity or national origin. And Judge Woods in no way suggested that he sought to provide general deterrence by sending a message to a particular group—whether ethnic or religious. This case is thus more akin to *Jones*, in which this Court rejected the defendant's argument that the district court impermissibly sentenced him for his association with a group that targeted Christians. *See* No. 22-2958, slip op., at 15-18 (2d Cir. Apr. 29, 2024). Notably, the defendant in *Jones* urged this Court to apply *Kaba* and *Leung*, and this Court refused. *Compare* Opening Brief of Appellant, *United States v. Jones*, No. 22-2958, 2023 WL 2586138 (Mar. 15, 2023) (repeatedly citing *Kaba* and *Leung*); *and* Reply Brief of Appellant, *United States v. Jones*, No. 22-2958, 2023 WL 4333070 (June 28, 2023) (same), *with Jones*, No. 22-2958, slip op. (2d Cir. Apr. 29, 2024) (declining to cite *Kaba* or *Leung*). Here, too, *Kaba* and *Leung* are simply inapplicable.

Even applying *Kaba* and *Leung*, however, Melzer's claim still fails. No "reasonable observer" who reviewed the sentencing transcript would conclude that Melzer's (or Judge Woods's) religious beliefs "played a role in determining [Melzer's] sentence." *Leung*, 40 F.3d at 586-87; *see Kaba*, 480 F.3d at 159. As discussed above, Judge Woods mentioned Judeo-Christian

26

values when reciting the background of the offenses; this discussion was relevant to show Melzer's motive and future dangerousness; and Judge Woods explicitly disclaimed reliance on Melzer's ideology in determining the appropriate sentence. Unsurprisingly, on this record, Melzer did not object to Judge Woods's comments at sentencing, suggesting that defense counsel did not perceive any bias. Because Judge Woods simply summarized O9A's attitudes towards Judeo-Christian values at the sentencing and did not reveal his own thoughts about them, no reasonable observer would perceive bias in his comments. Accordingly, even applying *Kaba* and *Leung*, Melzer's sentence satisfied both justice and the appearance of justice. *See Offut v. United States*, 348 U.S. 11, 14 (1954); *see also, e.g.*, *United States v. Carreto*, 583 F.3d 152, 160 (2d Cir. 2009) (sentences affirmed despite reference to defendants' national origin because the district court "did not say its sentencing of defendants was intended to serve as a message to people in Mexico" and "explicitly stated that defendants' national origin was not being considered"); *United States v. Tarricone*, 996 F.2d 1414, 1424 (2d Cir. 1993) (sentence affirmed despite reference to defendant's national origin because "it [was] clear that the District Court's concern was not the defendant's immigrant status, but his previous convictions and criminal associations").

27

## CONCLUSION

**The judgment of conviction should be affirmed.**

Dated:    New York, New York
April 29, 2024

Respectfully submitted,

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York,*
*Attorney for the United States*
*of America.*

SAMUEL ADELSBERG,
MATTHEW J.C. HELLMAN,
KIMBERLY RAVENER,
JAMES LIGTENBERG,
*Assistant United States Attorneys,*
*Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 6,371 words in this brief.

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York*

By: JAMES LIGTENBERG,
*Assistant United States Attorney*